**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BARBARA ANN HARTKE, an individual
on her own behalf and on behalf of the Estate
of decedent Gilbert V. Hartke

               Plaintiff,

      v.

BONHAM'S & BUTTERFIELD'S
AUCTIONEERS CORPORATION, A
DELAWARE CORPORATION; THE
CATHOLIC UNIVERSITY OF AMERICA,
A NON-PROFIT DISTRICT OF
COLUMBIA CORPORATION
Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.: 22-cv-03571-PGG

*District Judge: Hon. Judge Paul G. Gardephe*
*Magistrate:  Hon. Valerie Figueredo*

**DEFENDANT CATHOLIC UNIVERSITY OF AMERICA'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**
**WITH TEMPORARY RESTRAINING ORDER**

Shawn A. Brenhouse
Amin Al-Sarraf (*pro hac vice admission
pending*)
LOCKE LORD LLP
*Attorneys for Defendant Catholic University
of America*
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
shawn.brenhouse@lockelord.com
amin.alsarraf@lockelord.com

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    Father Gilbert V. Hartke, O.P. ...................................................................3

    B.    The Donation of the Dress to the University ............................................5

    C.    Catholic University's Uninterrupted Possession of the Dress ...................6

    D.    Estate Proceedings and the Dominican Order ..........................................7

    E.    The Auction and Plaintiff's Lawsuit.........................................................8

ARGUMENT .........................................................................................................................9

    A.    Legal Standard .........................................................................................9

    B.    Plaintiff Is Not Entitled To Any Relief Here Because She Has No Standing ..............10

        1.    The Complaint Fails to Sufficiently Demonstrate, Either on its Face or By the Facts Presented, that Plaintiff Has Any Ownership Interest in the Dress; It Is Not Reasonably in Dispute that Ms. McCambridge Donated the Dress to the University....................................................................................11

        2.    The Dominican Order – the Only Entity that Might Theoretically Have Standing Here – Disclaims Ownership of the Dress and Supports the University's Ownership and Intended Auction of the Dress....................................14

    C.    Plaintiff Fails to Satisfy the Requirements for a Preliminary Injunction.....................15

        1.    Plaintiff is unlikely to succeed on the merits...........................................15

        2.    Plaintiff cannot demonstrate irreparable harm.........................................17

        3.    The balance of equities weighs in favor of the University ........................18

        4.    The proposed injunction would disturb important public interests ...........19

    D.    If Any Form of Relief is Granted, the Court Should Require a Bond in Accordance With Fed. R. Civ. P. 65(c). ............................................20

CONCLUSION.....................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006)................................................................................1, 12

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011).....................................................................................11

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).............................................................................................11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................10, 11

*Bender v. Rochester*,
    765 F.2d 7 (2d Cir. 1985).........................................................................................4

*Block v. Fisher*,
    103 A.2d 575 (D.C. 1954) .......................................................................................16

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
    331 F.3d 342 (2d Cir. 2003)....................................................................................10

*Cacchillo v. Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011).......................................................................................9

*Carter v. Carter*,
    516 A.2d 917 (D.C. 1986) .......................................................................................17

*Classis of Central California v. Miraloma Community Church*,
    99 Cal. Rptr. 3d 449 (Cal. App. 1st Dist. 2009) ....................................................13

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*,
    790 F.3d 411 (2d Cir. 2015)....................................................................................10

*Day v. Case Credit Corp.*,
    2007 U.S. Dist. LEXIS 12465, 2007 WL 604636 (E.D. Ark. February 22,
    2007) .......................................................................................................................16

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996).......................................................................................20

*eBay v. MercExchange, L.L.C.*,
    547 U.S. 547 U.S. 388, 391 (2006)..........................................................................10

*Ferguson v. Tabah*,
    288 F.2d 665 (2d Cir. 1961)...................................................................................20

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ....................................................................20

*Greenpeace, Inc. v. Dow Chem. Co.*,
    97 A.3d 1053 (D.C. 2014) ......................................................................................16

*Hall v. Schoenwetter*,
    686 A.2d 980 (Conn. 1996) ....................................................................................16

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
    781 F.2d 264 (2d Cir. 1986).....................................................................................9

*Hill v. Lappin*,
    2012 U.S. Dist. LEXIS 91895, 2012 WL 2590476 (E.D. Ky. July 3, 2012)............3

*Int'l Controls Corp. v. Vesco*,
    490 F.2d 1334 (2d Cir. 1974)..................................................................................21

*Interlink Int'l Fin. Servs. V. Block*,
    145 F. Supp. 2d 312 (S.D.N.Y. 2001)......................................................................21

*Keepers, Inc. v. City of Milford*,
    807 F.3d 24 (2d Cir. 2015).......................................................................................9

*Lujan v. Nat'l Wildlife Fed'n (Lujan I)*,
    497 U.S. 871 (1990).................................................................................................9

*Lusk v. Vill. of Coldspring*,
    475 F.3d 480 (2d Cir. 2005)....................................................................................10

*Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021) ......................................................................................10

*Maine v. Adams*,
    672 S.E.2d 862 (Va. 2009)......................................................................................16

*Mantena v. Johnson*,
    809 F.3d 721 (2d Cir. 2015)......................................................................................9

*Medical Soc'y of the State of New York v. Toia*,
    560 F.2d 535 (2d Cir. 1977)......................................................................................9

*Melendez v. City of New York*,
    16 F.4th 992 (2d Cir. 2021) ....................................................................................11

iii

*Montero v. City of Yonkers*,
890 F.3d 386 (2d Cir. 2018)............................................................................11

*Munaf*,
553 U.S. at 689-90 .........................................................................................9

*Nokia Corp. v. InterDigital, Inc.*,
645 F.3d 553 (2d Cir.2011)............................................................................20

*Order of St. Benedict v. Steinhauser*,
234 U.S. 640 (1914)..................................................................................13, 14

*Ricard v. Williams*,
20 U.S. (7 Wheat.) 59 (1822)........................................................................16

*Rodriguez ex rel. Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999)...........................................................................10

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)........................................................................10, 18

*SEC v. Citigroup Global Mkts., Inc.*,
673 F.3d 158 (2d Cir. 2012)...........................................................................19

*Tutor Time Learning Ctrs., LLC v. KOG Indus.*,
2012 U.S. Dist. LEXIS 162124, 2012 WL 5497943 (E.D.N.Y. November 13,
2012) ...........................................................................................................19

*Wash. Univ. v. Catalona*,
437 F. Supp. 2d 985 (E.D. Mo. March 31, 2006) ......................................12, 13

*Willcox v. Stroup*,
467 F.3d 409 (4th Cir. 2006) .........................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................................................3, 18

## Statutes and Rules

D.C. Code § 19–309.........................................................................................17

D.C. Code § 19–310.........................................................................................17

D.C. Code § 20–1303.......................................................................................15

Fed. R. Civ. P. 65(c) ...................................................................................20, 21

**Treatises and Commentary**

11A Wright-Miller-Kane, Federal Practice and Procedure (2d ed. 1994)....................................21

Defendant the Catholic University of America (the "University") submits this Memorandum of Law in Opposition to Plaintiff Barbara Ann Hartke's ("Plaintiff") Motion for a Preliminary Injunction with Temporary Restraining Order (the "Motion"), and states as follows:

## INTRODUCTION

In 1973, Ms. Mercedes McCambridge, a renowned actress, gave a dress and underlying blouse that was worn by Judy Garland in the "Wizard of Oz" (the "Dress") to Father Gilbert V. Hartke, O.P., then-Chair of the drama department at Catholic University and a Roman Catholic priest of the Dominican Order. *See* Dkt. 1; Complaint ("Compl.") ¶¶ 8-9. Overwhelming, incontrovertible evidence, including contemporaneous accounts, establish that the Dress was given to Father Hartke for the benefit of the students in the drama department, and was kept in the department until earlier this year, nearly 50 years after Father Hartke retired.

In this action, Plaintiff Barbara Ann Hartke claims that the Dress was given to Father Hartke, her now-deceased uncle, and accepted by him, in his personal capacity. And that, as a result, she and other heirs of his estate own the Dress. She now seeks a preliminary injunction to prevent the Dress from being sold at auction by the University.

Plaintiff is not entitled to the "extraordinary and drastic" remedy of a preliminary injunction for at least the following reasons:

(1) she has no standing to bring her claims or seek an injunction because she fails to present sufficient allegations and facts to support her assertion that she has an ownership interest in the Dress;

(2) she is unlikely to succeed on the merits of the claim, including because: (a) *all* of the contemporaneous evidence related to the gift by Ms. McCambridge demonstrates that Ms. McCambridge intended to give the Dress to Father Hartke for the benefit of the students at the University's drama department, and not for his personal use or ownership; (b) Father Hartke could

1

not have taken personal ownership of the Dress as a priest of the Dominican Order because he signed the following vow upon entering the Order: "I do render myself incapable of possessing temporal goods as my own or of using them with a private right, so any contrary act, i.e., any act of receiving, retaining, selling, giving, exchanging, profiting, etc. on my own authority is an act that is null and void;" and (c) Father Hartke maintained the Dress in the University's drama department until his retirement in 1974, and thereafter it remained at the University until it was sent to the auction house Bonhams & Butterfields ("Bonhams") earlier this year;

(3) Plaintiff cannot demonstrate irreparable harm from the auction and sale of the Dress she seeks to enjoin because she cannot show that the Dress would not otherwise be sold upon the resolution of this action—in fact, her claim to the estate can only be (at most) one-fifth, so to satisfy her interests, the Dress would need to be sold.  Further, even if the estate had some interest in the Dress (it does not), an injunction would *hurt* Father Hartke's estate because other members of Father Hartke's family expressly support the sale of the Dress at auction as to benefit Catholic University's drama students[1];

(4) The balance of equities weigh in favor of the University given the significant efforts and resources expended to prepare for the auction and the lack of any compelling interests or likely harm to Plaintiff; and

(5) An injunction would disturb important public interests, including by encouraging plaintiffs to make meritless eleventh-hour challenges to cloud title on valuable items at auction

---

[1]       The proceeds from the sale of the Dress will support Father Hartke's legacy – his founding of the drama department at the University he long served.  This dispute is not really about honoring Father Hartke's legacy, or the sentimental value placed on a Dress Plaintiff has never possessed. (*See* Compl. ¶¶ 13-14.)  Plaintiff also cannot claim that she will personally retain the Dress given the number of Father Hartke's heirs.  Plaintiff is simply seeking money and "compensation."  Compl. ¶ 16 ("[The University's] intent to sell it without any compensation to its rightful owners").

with a payout in mind, undermining the finality of legal proceedings (here, probate proceedings from more than 30 years ago that confirmed that Father Hartke had no personal possessions in his estate), overlooking the express, written wishes of a deceased individual who made clear how his possessions were to be disposed of, and challenging the solemn religious vows taken by Roman Catholic priests of the Dominican Order.

In short, Plaintiff presents no evidence or other reasonable basis to establish any entitlement to the Dress, no Article III injury-in-fact, and no other plausible grounds for the "extraordinary remedy" that is a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Accordingly, the Court should deny the Motion.

## STATEMENT OF FACTS

### A.      Father Gilbert V. Hartke, O.P. [2]

Father Gilbert V. Hartke, O.P., as the Complaint acknowledges, served as a professor and the University's drama department chair for several decades, leaving an enduring legacy in the world of drama.  *See* Compl. ¶¶ 9, 14.  Specifically, Father Hartke, who passed away in 1986, founded the University's drama department in 1937 and chaired it until his retirement in 1974.[3] As the chair, Father Hartke received many donations and leveraged his position to garner those

---

[2]      Father Hartke's status as a Dominican priest as denoted by the O.P. in his full name is public knowledge. (*See* Affidavit of W.J. Shepherd, Exhibit B (court filings in his probate action); Decl. Thomas Tso, Ex. A, Bart Barnes, *Fr. Gilbert Hartke Dies; Built Catholic U. Theater,* The Washington Post (Feb. 22, 1986), at B6 (his obituary); Decl. Thomas Tso, Ex. B, Hon. Constance A. Morella, "In Honor of Father Gilbert V. Hartke, O.P.," 135 Cong. Rec. 22458-459 (Oct. 4, 1989); *see generally Hill v. Lappin*, 2012 U.S. Dist. LEXIS 91895, *1 n.2, 2012 WL 2590476 (E.D. Ky. July 3, 2012) (taking judicial notice of the full name).
[3]      *See* Decl. Thomas Tso, Ex. A, Bart Barnes, *Fr. Gilbert Hartke Dies; Built Catholic U. Theater,* The Washington Post (Feb. 22, 1986), at B6.

donations to support the University's drama program.  *See* Affidavit of W.J. Shepherd, Exhibit E (example of a gift to Father Hartke).[4]

Serving as "a Roman Catholic priest," Compl. ¶ 9, was another critical component of Father Hartke's identity.  Specifically, Father Hartke executed a Document of Renunciation of Temporal Goods on August 14, 1933 upon becoming a religious in the Dominican order.  (*See* Affidavit of W.J. Shepherd, Exhibit B.)[5]  The Document of Renunciation, which was filed in the probate proceedings, included two express vows that are critically relevant here: (1) "I do render myself incapable of possessing temporal goods as my own or of using them with a private right, so any contrary act, i.e., any act of receiving, retaining, selling, giving, exchanging, profiting, etc. on my own authority is an act that is null and void;" and (2) "Do declare that after solemn profession all goods which may in anyway accrue to me individually belong to the Order." *Id.*; *see also generally* Affidavit of Father LaToile (describing the practices of Dominican Roman Catholic priests).

Father Hartke was also a member of a large family, with six siblings.  (*See* Affidavit of Margo Carper, Exhibit A).  Five of his six siblings have descendants.  *Id.*  Plaintiff is a descendent of one of Father Hartke's brothers.  *Id.*  Descendants of two of Father Hartke's other siblings assert that if Father Hartke's estate possesses the Dress, then they would request a partition to use the

---

[4]      *See also* Decl. Thomas Tso, Ex. B, Pat Lewis, *Father Hartke – Washington's showbiz priest,* The Washington Star (May 7, 1979), at C-1, C-5.

[5]      These documents filed in court are subject to judicial notice.  Specifically, these documents were filed in the probate proceeding in connection with Father Hartke's estate by the representative of the estate at that time—the then-Treasurer of the local Dominican Order, of which Father Hartke was a member.  Plaintiff here is purporting to represent that same estate.  *See* Decl. Thomas Tso, Ex. D, Docket Entry for probate proceedings in D.C. Superior Court, 1986 ADM 001663, *In re Gilbert V. Hartke*; Affidavit of W.J. Shepherd, Exhibits B-D (copies of filings from those proceedings); *see generally* <u>Bender v. Rochester</u>, 765 F.2d 7, 12 (2d Cir. 1985) ("The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries.").

funds to support the drama department of the University.   (*See* Affidavit of Margo Carper; Affidavit of Thomas Kuiper).

### B.   The Donation of the Dress to the University

In 1973, Mercedes McCambridge, a famous and award-winning actress, served as the actress-in-residence at the University.[6]  In early March 1973, Ms. McCambridge publicly handed over the Dress to Father Hartke on the University's Campus and thereafter conducted an interview with the student newspaper.   (*See* Affidavit of W.J. Shepherd, Exhibit F).   As the student newspaper article, published on March 30, 1973, reported, "Mercedes McCambridge presents Judy Garland's 'Dorothy Dress' ***to the Speech and Drama department***."   *Id*. at page 1 (emphasis added).   It also stated that Ms. McCambridge "recently presented Father Gilbert Harkte with Dorothy's dress from the 'Wizard of Oz' in hopes that the precious gift will be a source of hope, strength, and courage ***to the students***."   *Id*. at page 7 (emphasis added).

The Washington Post, another contemporaneous source, confirms that Ms. McCambridge intended to donate the Dress to the University's drama department for the students. On March 1, 1973, The Washington Post wrote that "Mercedes McCambridge, actress-in-residence [sic] at Catholic University, has presented Judy Garland's Dorothy dress from the 'Wizard of Oz' ***to the university***." *See* Decl. Thomas Tso, Ex. E ,Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1973), at H9 (emphasis added).

In 1979, The Washington Star, in an in-depth exclusive with Father Hartke reported that "[Father] Hartke must turn over all his paychecks to the Dominicans within 24 hours. All of the 90 or so Dominican Priests at Catholic University, including [Father] Hartke, are given $35 a month. Gifts (like the car) become the monastery's, the community's or the drama school's

---

[6]      Megan Rosenfeld, "College Theater's Ten Finalists," *The Washington Post, Times Herald*, at H9 (Mar 1, 1973) (attached to  "Decl." of Thomas Tso, Exhibit E).

property (**which includes Judy Garland's dress in the Wizard of Oz** and much of Booth Luce's library.) The estate of Josephine McGarry Callan was turned over to Hartke to be used for Scholarships. He also inherited a 'six-figure income" to be invested for scholarships." *See* Decl. Thomas Tso, Ex. C, Pat Lewis, *Father Hartke – Washington's Showbiz Priest,* The Washington Star (May, 7, 1973), at C-5 (emphasis added).

### C.   Catholic University's Uninterrupted Possession of the Dress

Since early March 1973, the Dress has never left the campus or the University's possession. Father Hartke did not take the Dress home nor, consistent with his vows, did he ever accept the Dress as his personal possession, instead intending to display the Dress on campus. *See* Decl. Thomas Tso, Ex. E, Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1979), at H9 ("Father Hartke is making plans to put the costume on display in the Hartke Theater."). Indeed, when Father Hartke retired, he left the Dress at the University. (*See* Affidavit of Professor Gail Beach). During a visit to Father Hartke's office, Father Hartke told a relative that the Dress was **for the University**. (*See* Affidavit of Thomas Kuipers). Likewise, when Father Hartke showed students the Dress, he told them that the Dress was donated **to the University**. (*See* Affidavit of William Largess).

Throughout the decades since the donation, staff at the University regularly saw the Dress in the offices of the drama department until around 2006. (*See* Affidavit of Professor Gail Beach; noting the University allegedly misplaced or "relocated" the Dress and found the Dress on campus; *see also* Compl. ¶¶ 9-10). The University had possession of the Dress for nearly 50 years, and until 2006 in the offices of the drama department. Plaintiff never made any inquiry about the Dress despite being "well aware of the gift of the Dress when it occurred in the 70s" (Compl. ¶ 15).

Contrary to the Plaintiff's "information and belief," (Compl. ¶ 9) that the Dress was found "with Father's belongings", the Dress was misplaced (within the University) from around 2006 to

June 7, 2021 because of an office move. (*See* Affidavit of Professor Gail Beach).[7] Consistent with

the University's decades of possession, the Dress was found by itself in a box with a note from a

recently retired Professor and Chair of the Drama Department. (*See* Affidavit of Matthew Ripa).

      **D.**     **Estate Proceedings and the Dominican Order**

      In 1986, the Treasurer of Father Hartke's local Dominican Order filed a petition to probate

the estate of Father Hartke in the Superior Court of the District of Columbia.  *See* Decl. Thomas

Tso, Ex. D, Docket Entry for probate proceedings in D.C. Superior Court, 1986 ADM 001663, In

re Gilbert V. Hartke; Affidavit of W.J. Shepherd, Exhibit D.  In that probate proceeding, the

Treasurer served as the estate's personal representative, because the Order "is the largest creditor"

of Father Hartke.  *Id.*  It was made clear in the petition, consistent with his vows of poverty, that

Father Hartke had no will, no real property and no tangible personal property.  *Id.*  Father Hartke's

only listed property was the "right to publicize the decedent's name[.]" *Id.*  The Plaintiff was

notified of the estate's representations but never made any claim.  *Id.*[8]  Months later, the personal

representative, the Treasurer of the local Dominican Order, filed an inventory of the estate that did

not list any tangible personal or real property. (*See* Affidavit of W.J. Shepherd, Exhibit C).  Despite

being "well aware of the gift," Compl. ¶ 15, Plaintiff made no challenge to the inventory either.

(*See* Affidavit of W.J. Shepherd, Exhibit C).

      In a parallel lawsuit over ownership of Father Hartke's only property in his estate—the

right to use his name—the D.C. court ruled that the Dominican Order (the College of the

---

[7]      In fact, the Plaintiff admits publicly that she does not know what was found with the Dress. *See* Decl. Thomas Tso, Ex. F, Kathianne Boniello, *Battle Looms over $1.5M "Wizard of Oz" dress found in storage closet,* The New York Post (May 18, 2022).

[8]      Unfortunately, the petition mislabeled the Plaintiff's familial relationship to Father Hartke, but notice was nevertheless sent to her address at the time.  *See* Affidavit of W.J. Shepherd, Exhibit D, at 5.

Immaculate Conception)[9] inherited Father Hartke's rights, consistent with his vows.  (*See* Affidavit of W.J. Shepherd, Exhibit A).  The Dominican Order does not assert any claims to the Dress and confirms the University's ownership. (*See* Affidavit of Father LaToile).

       **E.**      **The Auction and Plaintiff's Lawsuit**

After rediscovering the Dress in 2021, Catholic University decided to list it for auction to raise money for the University's drama department.  In an announcement made by the University on or about April 19, 2022, the school said:

"A dress worn by Judy Garland in her role as Dorothy in 'The Wizard of Oz' will be auctioned in Los Angeles on May 24, with the proceeds used to help establish a new film acting program at The Catholic University of America's Benjamin T. Rome School of Music, Drama, and Art."[10] Between 2021 and 2022, the University and co-defendant Bonhams & Butterfields Auctioneers Corp. ("Bonhams") expended significant resources to market, publicize, and organize the auction of the Dress for May 24, 2022, to support the University's drama department and its students.

After recent media coverage of the auction, Plaintiff filed her complaint (the "Complaint") in this action seeking equitable relief and damages from the University and co-defendant Bonhams.

While asserting in this action that the estate of Father Hartke owns the Dress, Plaintiff is conceding publicly that she has no idea who owns the Dress.[11]

Among many other problems with her allegations, at a minimum as a self-described "representative" of the estate, Plaintiff knew or should have known that Father Hartke was a fully-

---

[9]     Now called the Dominican House of Studies.

[10]    Decl. Thomas Tso, Ex. G, Catholic University, "Lost 'Dorothy Dress' to be Auctioned for New Catholic University Film Program" (April 19, 2022).

[11]    Plaintiff is quoted as saying: "I just want to know who has ownership over this ... I'd like to see the documentation." *See* Decl. Thomas Tso, Ex. F, Kathianne Boniello, *Battle Looms over $1.5M "Wizard of Oz" dress found in storage closet,* The New York Post (May 18, 2022).

professed *Dominican* who could not accept gifts in his personal capacity and therefore could not own the Dress personally.

## ARGUMENT

### A.     Legal Standard

"When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990).  Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot "rest on such 'mere allegations,' [as would be appropriate at the pleading stage] but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal citation omitted)."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).  To establish Article III standing, a claimant must demonstrate: (1) an injury-in-fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that can likely be redressed by a favorable decision. *Mantena v. Johnson,* 809 F.3d 721, 731 (2d Cir. 2015). "'The party invoking federal jurisdiction bears the burden of establishing prudential and constitutional standing.'" *Keepers, Inc. v. City of Milford,* 807 F.3d 24, 39 (2d Cir. 2015).

A preliminary injunction is an "extraordinary and drastic remedy [and] never awarded as of right." *Munaf,* 553 U.S. at 689-90; *see also Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"); *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) (preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted"). Second Circuit precedent requires a party seeking a preliminary injunction or temporary restraining order to: "(1) demonstrate that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) likelihood of success on the merits or (b) sufficiently

serious questions going to the merits for making them a fair ground for litigation, and a balance of hardship tipping decidedly in its favor." *See Lusk v. Vill. of Coldspring*, 475 F.3d 480, 485 (2d Cir. 2005) (internal quotation marks omitted).   The court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay v. MercExchange, L.L.C.*, 547 U.S. 547 U.S. 388, 391 (2006).   When a preliminary injunction would disrupt the status quo, rather than maintain it, a movant must satisfy "'an even higher standard of proof' by showing a 'clear' or 'substantial' likelihood of success."   *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003); *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999).   Finally, the Court must ensure that a preliminary injunction would not subvert the "public interest."   *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

### B.   Plaintiff Is Not Entitled To Any Relief Here Because She Has No Standing

Plaintiff asserts, simply, the "controversy [that] exists between the Parties in this case" is "with respect to the title to the dress[.]" Compl. ¶ 19.   Plaintiff fails to plausibly establish an actual case or controversy under Article III.   In order for her asserted controversy to exist, Plaintiff must plausibly assert or establish a right to the title to the Dress and injury-in-fact to that right to title. Plaintiff has not asserted, whether facially or factually, a plausible claim to the Dress's "title" on "which a cloud could settle."   *See Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021) ("In short, the Maddoxes had no title on which a cloud could settle."); *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-19 (2d Cir. 2015).

As a facial matter, courts require "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.   A

complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). "The complaint's allegations, however must be 'plausible on [their] face,' a standard that 'asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (finding claim implausible where "obvious alternative explanation" for challenged conduct existed); *Melendez v. City of New York*, 16 F.4th 992, 1013 (2d Cir. 2021).

Here, the Complaint's assertion of ownership of the Dress is predicated on the purely speculative assertion that, in 1973, Mercedes McCambridge (who is deceased) intended to give the Dress to Father Hartke in his personal capacity and that he so accepted. Compl. ¶ 10. No factual enhancement was provided to support this assertion, including as to the intent behind this specific gift. Further, the Complaint ignores two obvious inferences: (1) Mercedes McCambridge gifted the Dress to Father Hartke as the University's representative, where he "was long employed as a University Professor and Drama," and Father Hartke accepted the Dress in that capacity, *see* Compl. ¶ 10; and, (2) even if McCambridge, as alleged, gifted the Dress to Father Hartke, in his personal capacity, Father Gilbert V. Hartke, O.P., a "Roman Catholic priest," *see* Compl. ¶ 9, was not able to accept gifts in that capacity, or to pass them on as personal property in his estate (indeed he had no estate per se).

1.  **The Complaint Fails to Sufficiently Demonstrate, Either on its Face or By the Facts Presented, that Plaintiff Has Any Ownership Interest in the Dress; It Is Not Reasonably in Dispute that Ms. McCambridge Donated the Dress to the University**

"[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading*

*Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-147 (2d Cir. 2011). Here, Plaintiff asserts conclusorily that "the gift of the dress to Gilbert V. Hartke was to thank Hartke for his counseling," Compl. ¶ 10. Devoid of any facts or evidence supporting this statement, the Complaint ignores the facts and evidence in the auction description itself (referenced and incorporated into the complaint at Compl. ¶ 7).[12] The auction description references a contemporaneous newspaper article memorializing McCambridge's intent: "The gift was recorded in an article at the time for the University newspaper, Tower, published March 30, 1973." Decl. Thomas Tso, Ex. H, Bonhams, "An Important Costume worn by Judy Garland as Dorothy in The Wizard of Oz." The article itself states, that "Mercedes recently presented Father Gilbert Hartke with Dorothy's dress from 'The Wizard of Oz' in hopes: that the precious gift will be a source of hope, strength, and courage to the students." Affidavit of W.J. Shepherd, Exhibit F, p. 7.

Even apart from the facial challenge, Plaintiff fails to identify facts that McCambridge gave Father Hartke the Dress in his personal capacity and that Father Hartke so accepted. Instead, Plaintiff's assertions made upon "information and belief," which are insufficient. *See All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 86 n.4 (2d Cir. 2006) ("Article III standing needs to be established, not merely pleaded, in order to give a federal court the authority to exercise federal question jurisdiction."). Plaintiff's claim of "an inter vivos gift" "requires donative intent, delivery, and acceptance." *Wash. Univ. v. Catalona*, 437 F. Supp. 2d 985, 998 (E.D. Mo. March 31, 2006). Contemporaneous evidence of the intent and other elements are

---

[12]     Plaintiff's Complaint only includes a portion of the description on Bonhams' website. Compl. ¶ 7; *See* Bonhams' full description, Decl. Thomas Tso, Ex. H, Bonhams, "An Important Costume worn by Judy Garland as Dorothy in The Wizard of Oz." The referenced description also includes a reference to the *Tower* article which can be found at Affidavit of W.J. Shepherd, Exhibit F.

dispositive.  *Id.*   Here, the contemporaneous evidence as to the intent behind this *specific* gift all support the record in the publication the *Tower*: that Ms. Mercedes gave this gift to the University for its students. Affidavit of W.J. Shepherd, Exhibit F. A contemporaneous Washington Post article reported the same intent. (*See* Decl. Thomas Tso, Ex. E, Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1973) at H9).  Father Hartke's conduct and statements post-donation support that intent and the University's nearly 50 years of ownership and possession confirms the intent.  (*See* Affidavit of Professor Gail Beach; Affidavit of Bill Largess; Affidavit of Thomas Kuipers; Decl. Thomas Tso, Ex. C, Pat Lewis, 'Father Hartke – Washington's Showbiz Priest', *The Washington Star* (May, 7, 1973) at C-5.) Plaintiff presents no contrary contemporaneous facts or evidence as to this specific gift.

Plaintiff also ignores a crucial element: Father Hartke's acceptance of that gift as his personal possession.  The court may take judicial notice of Father Hartke's full name and his estate records that indicate he is a fully-professed *Dominican* – records that Plaintiff knows or should know as a putative representative of the estate. (*See e.g.,* Affidavit of W.J. Shepherd, Exhibit B). Father Hartke took vows that he would not accept gifts in his personal capacity and would have treated such a gift as void.  *See Order of St. Benedict v. Steinhauser*, 234 U.S. 640 (1914) (enforcing these vows as "contract").  The rules of the Dominican Order explicitly reject any acceptance of property in a priest's *personal* capacity.  (*See* Decl. Thomas Tso, Ex. I, Dominican Friars, Province of St. Joseph, Rule of St. Augustine, Chapter 1.3 ("Do not call anything your own; possess everything in common"); *see generally Classis of Central California v. Miraloma Community Church*, 99 Cal. Rptr. 3d 449, 453 (Cal. App. 1st Dist. 2009) (taking judicial notice of church rules).[13]  Father Hartke did not accept other gifts in his personal capacity, consistent with

---

[13]      *See also* Affidavit of Father LaToile.

13

the inventory of the estate conducted in 1987, listing nothing of value in personal possessions or any tangible property of any sort, despite documented gifts to Father Hartke over the years.  (*See* Affidavit of W.J. Shepherd, Exhibits C, D, and E).  Based purely on the facts, as alleged, the complaint does not plausibly allege the plaintiff has title to the Dress.

Plaintiff's Complaint has limited factual assertions.  However, the incorporated documents, the contemporaneous records, and judicially noticeable court and church documents all point to the obvious explanation that Ms. McCambridge donated the Dress to Father Hartke as a representative of the University for the benefit of the University's drama students.  He accepted the donation only in that capacity consistent with Father Hartke's vows.

> **2.    The Dominican Order – the Only Entity that Might Theoretically Have Standing Here – Disclaims Ownership of the Dress and Supports the University's Ownership and Intended Auction of the Dress**

In the probate proceedings related to the estate of Father Hartke, the representative of the estate at that time was the College of Immaculate Conception (Dominican Order).  (*See* Affidavit of W. J. Shepherd, Exhibit D).  In those proceedings, the probate court recognized that Father Hartke had vowed that all goods that "may in anyway accrue to [him] individually belong to the Order[.]" (Affidavit of W.J. Shepherd, Exhibit B).  And, that no personal or real property passed into his estate consistent with these vows and despite well-known gifts to him over the years. (Affidavit of W.J. Shepherd, Exhibits C, E).  The only obvious and reasonable explanation is that, consistent with his vows or "contract," *see Order of St. Benedict*, 234 U.S. at 649, Father Hartke disposed of all personal property to the Dominican Order before his passing.  *See id.* (upholding a similar agreement to "renounce[ ] 'all individual ownership of property, present or future, real or personal.'").  This is consistent with the inventory of the estate conducted in 1987, listing nothing of value in personal possessions or any tangible property of any sort, despite documented and public gifts to Father Hartke over the years, including the Dress. (*see* Affidavit of W.J. Shepherd,

Exhibits C, D).  Any claims against how the estate was inventoried or how personal property was excluded have long expired by the statute of limitations. *See* D.C. Code § 20–1303.

Even if Plaintiff is correct that McCambridge gifted Father Hartke the Dress in his *personal* capacity, Plaintiff assumes that Father Hartke accepted it and maintained it in his personal capacity. To the contrary, Father Hartke's personal belongings and effects were always owned by the Dominican Order.

Father Hartke never left the Order, and in a prior dispute over rights in his estate, the familial heirs did not object to the passing of Father Hartke's sole property right at the time, the right to publicity, to the College of the Immaculate Conception (Father Hartke's Dominican Order) in accordance with his vows.[14]  The Dominican Order does not contest the University's ownership of the Dress.  (*See* Affidavit of Father Latoile). Whether the Dress belongs to the estate or not, Plaintiff has no right to title, no stake in any controversy, and therefore, no standing.

### C.    Plaintiff Fails to Satisfy the Requirements for a Preliminary Injunction

#### 1.    Plaintiff is unlikely to succeed on the merits

Even if the Plaintiff establishes standing, Plaintiff's claim has no merit and is unlikely to succeed.  The arguments and contemporaneous evidence, described in the prior sections, completely support the University's ownership of the Dress from 1973 and confirms Ms. McCambridge's specific intent to support the University's drama students with her donation. Father Hartke's vows, conduct, estate proceedings, and Ms. McCambridge's intent establish that the University clearly owns the Dress and always has since 1973.

In addition, to the surfeit of dispositive evidence, Plaintiff is unlikely to succeed on the merits for additional reasons.  First, "[u]ndoubtedly,' noted the Supreme Court, "if a person be

---

[14]    The right to publicity was arguably not a "temporal good" covered by his vow, unlike the Dress at issue today.  *See* Affidavit of W.J. Shepherd, Exhibit B.

found in possession . . . it is prima facie evidence of his ownership." *Ricard v. Williams,* 20 U.S. (7 Wheat.) 59, 105 (1822); *see also Willcox v. Stroup*, 467 F.3d 409, 412 (4th Cir. 2006). "There is an old saying that 'Possession is nine-tenths of the law.' . . . The common law makes this old saying more than just a proverb – it is a rule of law that still holds sway." *Day v. Case Credit Corp.,* 2007 U.S. Dist. LEXIS 12465, *17, 2007 WL 604636 (E.D. Ark. February 22, 2007). "Under the common law, possession of personal property raises a rebuttable presumption of ownership." *Hall v. Schoenwetter*, 686 A.2d 980, 984 (Conn. 1996) (citing authorities). "The common law provides that possession of property constitutes prima facie evidence of ownership until a better title is proven." *Maine v. Adams*, 672 S.E.2d 862, 867 (Va. 2009).

The University retained possession over the Dress since the day Ms. McCambridge donated the Dress to the University on campus. Father Hartke received the Dress during school hours, on school property, and kept the Dress in his office, often showing the Dress to others. (*See* Affidavit of Bill Largess). Father Hartke did not lose or misplace the Dress.[15] Again, consistent with the other evidence and his vows as a Dominican Priest, Father Hartke *voluntarily* left the Dress with the University when he retired, not taking it home or transferring it to any relatives.[16] Father Hartke's treatment of the Dress during his lifetime, by leaving it in the University, is fully consistent with his vow to never take any tangible item to be his personal property. The Dress was then stored in the University continuously for the next several decades. As the complaint admits,

---

[15]     Affidavit of Professor Gail Beach (noting the University had full account of its location at least until 2006).

[16]     Even if Father Hartke owned the Dress personally at some point; he abandoned the Dress by leaving it to the University, consistent with his vows and his lifelong legacy to support the students as Ms. McCambridge intended. "'[A] conversion claim cannot be grounded on abandoned property,' since the abandoning party can no longer assert a right to the property over which he or she intentionally relinquished control." *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1063 (D.C. 2014); *see also Block v. Fisher*, 103 A.2d 575, 576 (D.C. 1954) ("Abandonment of personal property is a complete defense to an action for conversion." (citation omitted)).

the "relocation" occurred within the University, Compl. ¶ 9, and the University lost track internally

of the Dress between 2006 and 2021, and when the Dress was found, it was in a box and bag within

the University, and not with any other objects related to Father Hartke. (*See* Affidavit of Matthew

Ripa). Based on this and other reasons, Plaintiff has no likelihood to succeed on the merits.

### 2.     Plaintiff cannot demonstrate irreparable harm

In accordance with the governing D.C. law surrounding "Descent, Distribution, and Trust,"

even if the Dress is part of the estate of Father Hartke, Father Hartke died intestate, without direct

descendants and no living parents at the time of probate.  (*See* Affidavit of W. J. Shephard, Exhibit

D).   Accordingly, under D.C. Code § 19–309, "the brother, sister, or child or descendant of a

brother or sister is entitled to the whole."   Further, where there are multiple brothers and sisters,

under D.C. Code § 19–310, each brother or sister "is entitled to an equal share, and the children or

descendants of a brother or sister of the intestate, stand in the place of their deceased parents

respectively."   In accord with the Affidavit of Margo Carper, Father Hartke had six brothers and

sisters, and five of those siblings have living descendants. (*See* Affidavit of Margo Carper, Exhibit

A).  Two of those lines of the family (sister Inez Hartke and brother Joseph Ward Hartke) support

a partition and auction in support of the students of Catholic University if the Dress had indeed

been in Father Hartke's estate, which they deny. ((*See* Affidavit of Margo Carper; Affidavit of

Thomas Kuiper; *see generally Carter v. Carter*, 516 A.2d 917, 920 (D.C. 1986) ("A cotenant's

unilateral right of partition is an integral element of the form of property ownership inherited from

English law known as the tenancy in common.")).[17]

"Issuing a preliminary injunction based only on a possibility of irreparable harm is

inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only

---

[17]     Plaintiff clearly did not seek the input of these family members in asserting the purported
claims on behalf of Father Hartke's estate.

be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375-76; *see also Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).  Here, Plaintiff has not demonstrated even the *possibility* of irreparable harm arising from the intended auction and sale of the Dress, let alone a clear showing.  In fact, under any circumstance, given the interests and wishes of other heirs to the estate, the Dress would necessarily have to be sold.  In other words, an auction does not cause the estate any irreparable injury.

The only possible injury to the Plaintiff would be purely economic in the form of Plaintiff's alleged one-fifth share of the proceeds after a partition (given Father Hartke's five siblings with living descendants).  There are plenty of "remedies available at law, such as monetary damages" adequate "to compensate for that injury."  In fact, *not proceeding* with the auction would harm the estate (and if she were to succeed, Plaintiff as well).  The estate would need to invest the time and money on a subsequent auction when interest in the Dress may wane.  Moreover, the estate's costs of litigation will further diminish the recovered value of the Dress.

On the other hand, the University that will be harmed should the auction not proceed, as discussed below.

### 3.      The balance of equities weighs in favor of the University

Similar to the analysis under irreparable injury, the balance of equities favors the University.  The University spent over a year and significant resources to promote an auction in support of the drama students that Father Hartke and Mercedes McCambridge intended to support.  At the eleventh hour, one heir with, at most, a one-fifth share of the estate, now requests that the auction not proceed.  However, Plaintiff fails to submit any evidentiary support for any claim on the Dress or any right to keep the Dress as a whole for herself.  Issuing an injunction would not only harm the value of the Dress by placing ownership under a cloud when no evidence for the estate's competing claims exist, it would render wasted all the time and energy invested by the

University to maximize the value of the Dress.  Likewise, it will impose additional costs on the estate down the road.  Further litigation would only deplete any return from the Dress to serve Ms. McCambridge and Father Hartke's intent to support the University's drama students.  If Plaintiff is asking for her one-fifth share of the proceeds, Compl. ¶ 9, to which she is not entitled, the University agrees to put the money in escrow after the sale pending a final adjudication. Accordingly, Plaintiff suffers no hardship, but rather benefits from the University's efforts to maximize her alleged inheritance.

### 4.    The proposed injunction would disturb important public interests

Even in suits between private parties, the moving party must still demonstrate that a preliminary injunction would not harm the public interest.  *See SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 163 n.l (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest."); *Tutor Time Learning Ctrs., LLC v. KOG Indus.*, 2012 U.S. Dist. LEXIS 162124, *20-21, 2012 WL 5497943 (E.D.N.Y. November 13, 2012).  Here, an injunction to stop a planned auction would only encourage plaintiffs with specious claims to file suit at the last minute before auctions to place a cloud on title, damage the rightful owners, and extract financial settlements by putting pressure on the parties planning the auction.

An injunction would also be inconsistent with the prior adjudication (more than 30 years ago) of the probate proceeding whereby the estate of Father Hartke was recognized to not have any personal possessions and was disposed of according to governing law.  Allowing a severely belated claim to the estate to serve as the basis for the extraordinary remedy of an injunction would not serve the public interest in the finality of legal proceedings.

An injunction would be further inconsistent with the wishes of Father Hartke, which are clear and not in dispute: that any gifts to him personally are null and void, and (even assuming he

19

could accept the Dress personally), all of his personal possessions belong to the Dominican Order. Therefore, an injunction would not serve the public interest in following the clear, written wishes of deceased individuals.

Finally, an injunction would unduly implicate and undermine the religious vows taken by Father Hartke and other priests of the Dominican Order, disclaiming personal gifts and possessions.  By permitting Plaintiff to enjoin the auction of the Dress, those vows would be upended – no less in favor of a claim that lacks merit.  This would run contrary to the public interest in respecting and preserving the freedom of religion, as enshrined in the First Amendment.

Accordingly, an injunction would disturb and disrupt important public interests.

**D.      If Any Form of Relief is Granted, the Court Should Require a Bond in Accordance With Fed. R. Civ. P. 65(c).**

The Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis supplied).  The bond requirement incorporated into Fed. R. Civ. P. 65(c) "assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff."  *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir.2011).

The Court "is vested with wide discretion" to determine the appropriate size of a bond posted under Fed. R. Civ. P. 65(c).  *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961); *see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (noting that amount of bond rests in court's discretion); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (same).

To that end, the language of Fed. R. Civ. P. 65(c) "mandates security for such damages as 'may' (not 'will') be suffered by a party subsequently found to have been wrongfully enjoined." *Interlink Int'l Fin. Servs. V. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001).  Thus, a Fed. R. Civ. P. 65(c) bond "will usually be fixed in an amount that covers the 'potential' costs and losses the enjoined party will suffer as the result of being enjoined or restrained." *Id.* (internal citation omitted).  "[I]n setting the amount of security for a preliminary injunction, the trial court should err on the high side," because "an error on the low side may produce irreparable injury" to the wrongfully enjoined party.  Id. (internal citations and quotation marks omitted).  Nevertheless, the Court "may dispense with the posting of security where there has been no proof of likelihood of harm to the party enjoined."  *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974); *see also* 11A Wright-Miller-Kane, Federal Practice and Procedure (2d ed. 1994) at 293 ("[T]he court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant.").

Here, Plaintiff asks for a temporary restraining order and preliminary injunction wiping out nearly a year of marketing, publicizing, and organizing the sale of the Dress.  (ECF No.7, p. 2.) Plaintiff asks that these restraints remain in place throughout the pendency of the action until the "claims in the Verified Complaint are adjudicated" which would further create uncertainty in the market and severely impacts Defendants' ability to market the Dress. Plaintiff's proposed preliminary injunction is also significant, disrupting a long-standing contractual arrangement between the Defendants and enormous efforts to put the Dress up for auction.  These circumstances, and the obvious financial impact of having to cancel the scheduled auction of the Dress warrants a substantial security reflecting, at the very least, the aggregate amount expended to prepare for the scheduled sale and to proceed to sale at some later date. However, Defendants'

costs in increasing awareness, creating publicity, and organizing the auction would have been wasted if the injunction was erroneously granted.  Consequently, in the event the Court grants any relief, a bond is necessary to account for that cost to Defendants.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion and order such further relief as the Court deems just, necessary, and proper.

May 18, 2022

*/s/ Shawn A. Brenhouse*
Shawn A. Brenhouse
Amin Al-Sarraf (*pro hac vice admission pending*)
LOCKE LORD LLP
*Attorneys for Defendant Catholic University of America*
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
shawn.brenhouse@lockelord.com
amin.alsarraf@lockelord.com
