estate was The College of the Immaculate Conception on behalf of Joseph P. Allen, O.P. *Id.* at 000080-87.

Petitioner, an heir of Father Hartke, now seeks to re-open administration of his 1986 probate estate to benefit herself. In her Petition to Reopen Probate, Petitioner claims that, during his lifetime, Father Hartke personally received and continued to own until his death a dress worn by Judy Garland (the "Dress") in the film *The Wizard of Oz*. Petitioner posits that the Dress was a probate asset that should have been included in the Inventory for Father Hartke's Estate, and that the failure to do so might somehow be properly remedied by reopening the Estate and putting Petitioner in charge.[3]

The University, as the rightful owner of the Dress, seeks to auction the Dress to raise scholarship funds. Ex. 2, at 000046-48. In response to the University's public announcement on April 19, 2022, that the Dress would be Auctioned, see Ex. 2, at 00046, on May 3, 2022, Petitioner filed for, and has been granted a Temporary Restraining Order from the Federal Court in the SDNY Case, temporarily enjoining the auction.

On June 8, 2022, in this Court, Petitioner filed her Petition to Reopen, which aims to re-open Father Hartke's probate estate and have herself appointed as Personal Representative. The University, as the rightful owner of the Dress for nearly 50 years, disputes Petitioner's self-serving claims and seeks here to intervene to be heard in opposition to the Petition.

Petitioner readily concedes that Father Hartke was ordained as a priest of the Order of Preachers (O.P.), also known as the Dominicans. Ex. 3, ¶ 3. As such, Father Hartke *necessarily took a life-long vow of poverty*, Ex 2, at 000077. Based on his well-documented life, Father Hartke

---

[3] Several of the other heirs have provided affidavits which swear to selflessly (and, consistent with Father Hartke's vow of poverty and in recognition of the nearly universally recognized charitable purpose of the original gift) commit the proceeds from the Dress back to Father Hartke's beloved Drama Department at the University, should Petitioner prevail.

never held tangible property, goods, or assets in his personal capacity. *Id.* Furthermore, Father Hartke signed a "Document of Renunciation of Temporal Goods" on August 14, 1933, by which he renounced ownership of any property and agreed to transfer any future property to the Dominican Order, specifically to The College of the Immaculate Conception. Ex. 2, at 00079. Thereafter, Father Hartke remained a member of the Dominican Order and, later served as the Chair of the University's Drama Department until his death. Ex. 3, ¶4.

A March 1973 Article from the *Washington Post* explains the origins of the Dress, and confirms its ownership:

> Mercedes McCambridge actress-in-residence at Catholic University, has presented Judy Garland's Dorothy dress from "The Wizard of Oz" to the university. Miss McCambridge was given the dress by Miss Garland. Father Hartke is making plans to put the costume on display in the Hartke Theater.

Ex. 2, at 000039. Mercedes McCambridge's gift of the Dress to the University was publicly known. It was reported in at least two newspapers at the time of the gift in 1973. *Id; see also* "Dorothy's Dress Offers Inspiration and Hope" (The Tower, March 30, 1973. Ex. 2 at 000095) ("Mercedes recently presented Father Gilbert Hartke with Dorothy's dress from 'The Wizard of Oz' in hopes that the precious gift will be a source of hope, strength, and courage to the students."). The Dress again made the news in a 1979 Washington Star Article, *Washington Star Article,* "Father Hartke-Washington's Showbiz Priest" Ex. 2, at 000037-39. Yet with no issues as to her legal capacity throughout the relevant period, see Ex. 3, Petitioner raised no legal challenge at any time to the University's ownership of the Dress as a consequence of Ms. McCambridge's publicly reported gift.

Because of his lifelong vow of poverty and his lifelong priesthood in the Dominican Order, Father Hartke could not, and did not own the Dress.[4] This vow of poverty and resulting claim of

---

[4] The Order makes no claim to the Dress. Ex. 2, at 000098, ¶8.

title to the Dress are explained in the 1979 Washington Star Report: "Gifts...become the monastery's or the drama school's property (which includes Judy Garland's dress in the Wizard of Oz and much of Clair Booth Luce's library.)."

This Court may take judicial notice of its own records. *Harrison*, 76 A.3d 826, 833 (D.C. 2013) ("a court may take judicial notice of its own records."). The Inventory filed in the probate administration of Father Hartke's estate, ***long ago approved by this Court,*** reflects Father Hartke's vow of poverty, and demonstrates that the only asset Father Hartke had at his death was the intangible asset of his name rights properly admitted at that time, and that all other categories of property in his name were valued as $0.00.   Ex. 2, at 000080-82.  In addition to the approved inventory, this Court may take judicial notice as well that Notice of the 1986 probate proceedings was sent to all of Father Hartke's heirs and other interested parties. Ex. 2, at 000087.[5]

Likewise, this Court may take judicial notice that Notice of the probate proceedings was required to be published in two newspapers when the original Personal Representative was appointed in 1986, and proofs of such publications were required to be filed with this Court. D.C. Code Ann. § 20-704 (1981); SCR-PD B-2 (formerly SCR-PD 103(b)(3)). As proof of such publication, the Representative included a certification with the Inventory, that such Proofs of Publication were contemporaneously or previously filed. *See* Ex. 2, at 000081.

Attached hereto as Exhibit 3 is the "Certification....In Support of Preliminary Restraints" (the "Petitioner's Certification") that Petitioner filed in the SDNY Case.  Ex. 3.  Petitioner's Certification makes it clear that Petitioner was aware in 1986 of Father Hartke's passing.  Ex. 3, ¶¶3, 10.  Petitioner admits to discussing Father Hartke's passing with Father Hartke's friend, and

---

[5] Petitioner, whose Amended Complaint states that she is a "retired Chicago school teacher" (Ex. 1, ¶15), is listed at a Chicago address on the List of Interested Persons on the Petition for Probate.  Ex. 2 at 000087.

colleague in the University's Drama department, Mercedes McCambridge, the source of the Dress. *Id.*, ¶¶10-1. In other words, Petitioner had the opportunity to discuss the Dress with Ms. McCambridge, but apparently failed to do so. Ex. 3, ¶ 11. Moreover, Petitioner is legally deemed to have had notice (if not actual notice) of the Estate's reported inventory and has nevertheless taken no action despite several decades of opportunity to do so.

## II.   MOTION TO INTERVENE

The Petitioner did not identify the University as an interested party in her Petition in this Court. Also, the University was not an interested party at the time the original Petition for Probate was filed in 1986.[6]  However, in both the Petition and in the SDNY Case, Petitioner's claims directly challenge the University's ownership of the Dress.  Ownership of the Dress is the sole basis that Petitioner asserts in favor of reopening Father Hartke's Estate.  Therefore, the University is compelled to protect its interests, and moves to intervene in this Estate to oppose the Petition.

Except where there is a conflict, the Superior Court Rules of Civil Procedure are applicable in cases in the Probate Division.  SCR-PD 1(e).  Thus, applicable here, Superior Court Civil Rule 24 (a) governs intervention as of right, and states in pertinent part:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

D.C. Super. Ct. R. Civ. P. 24 (a).

---

[6] Nor should it have been.  The University itself owned the Dress.  Therefore, the Dress was not a part of Father Hartke's Estate.  Other than the right to publicize Father Hartke's name which had already been determined through separate civil action, the University had no interest in Father Hartke's estate. Ex. 2m at 000074-76.

The University owns the Dress.  Because the Petition seeks to reopen the Estate and challenge the University's ownership of the Dress by claiming that the Dress is an Estate asset, the University may intervene in this proceeding as a matter of right, to protect its interest in the Dress.

Superior Court Civil Rule 24 (b) governs permissive intervention and states in pertinent part:

> (1) *In General.* On timely motion, the court may permit anyone to intervene who:
> (A) is given a conditional right to intervene by an applicable law; or
> (B) has a claim or defense that shares with the main action a common question of law or fact.
>
>         \*       \*       \*       \*       \*
>
> (3) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

D.C. Super. Ct. R. Civ. P. 24 (b).  The "common question" of ownership of the Dress therefore sufficiently serves to justify permissive intervention under SCCR 24(b) even if intervention as of right is not recognized under SCCR 24(a).

For these reasons, the Court should permit the University's intervention in the case under either SCCR 24(a) or (b), or both.

## III.   OPPOSITION TO THE PETITION TO REOPEN

Petitioner cannot establish that she acted with vigilance in pursuing her claims after over three decades of inaction. The Court should deny the Petition to Reopen the Estate with prejudice as it would be futile and unfairly prejudice the University. [7] (Petition to reopen or amend a prior

---

[7] Attached to this Opposition as Exhibit 2 is "Defendant Catholic University of America's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction with Temporary Restraining Order" (the "TRO Opposition"). Because the TRO Opposition is voluminous, and addresses issues (such as jurisdiction and standing) relevant only in the New York proceedings, the University limits itself here to the defenses and arguments applicable to the issues pending before this Court.  The University reserves the right to raise additional defenses should the Petitioner subsequently set forth a cogent case.  In the meantime, the University does not waive, and hereby expressly reserves, the right to assert all arguments in the SDNY Case no. 1:22-cv-03571-PGG, along with any additional defenses that may arise.

complaint will be denied by the court when such an action would be futile.). *See Colvin v. Howard Univ.*, 257 A.3d 474, 479-480 (D.C. 2021).

### A.   PETITIONER HAS NO FACTUAL BASIS TO CLAIM THAT THE DRESS BELONGED TO FATHER HARTKE IN HIS PERSONAL CAPACITY.

Father Hartke's life and legacy, which Petitioner does nothing to refute, directly defy Petitioner's claim. Petitioner puts forth no valid basis upon which to claim that Father Hartke disavowed or betrayed his vow of Poverty, i.e., the Rule of St. Augustine[8], and or that he revoked his "Document of Renunciation of Temporal Goods" signed in 1933.[9]

Petitioner agrees that, "Father Hartke was a priest of the Order of Preachers (O.P.) also known as the Dominicans…. [and] as long as [she] can remember until his death in 1986, he resided at the Dominican House and taught drama at the Catholic University in Washington, D.C." Ex. 3, ¶4.  Under all of the circumstances, it is patently absurd, and rightly offensive to Father Hartke's order, and life's mission, for Petitioner to claim that Father Hartke created a "special exception" to his vows, in order to personally possess the Dress, refuse to transfer it to The College of the Immaculate Conception as required by the "Document of Renunciation of Temporal Goods", and harbor it until his death, in order to pass it on to her.

However, for purposes of Rule 11, it is clear that Petitioner's submissions in the SDNY Case are devoid of any affirmative evidence that might suggest that Father Hartke sought to give the Dress to Petitioner and other blood-related heirs.   First, Petitioner's Amended Complaint

---

[8] With respect to individual worldly possessions and the vow to have none, the Rule of St. Augustine, which Father Hartke took and by all accounts abided by, states: 3. *Do not call anything your own; possess everything in common.* Your superior ought to provide each of you with food and clothing, not on an equal basis to all, because all do not enjoy the same health, but to each one in proportion to his need. *For you read in the Acts of the Apostles: 'They possessed everything in common'*, and 'distribution was made to each in proportion to each one's need.'4. *Those who owned anything in the world should freely consent to possess everything in common in the monastery.* Ex. 1, at 000062. (Emphasis added).

[9] Father Hartke's "Document of Renunciation of Temporal Goods" from 1933 provides for the transfer of any possessions that accrue to him to The College of the Immaculate Conception. Ex. 2 at 00079.

contains nothing to indicate that Father Hartke ever discussed the Dress with her.[10]   Ex. 1 (Amended Complaint, *passim*).   Second, although Petitioner's "Certification" acknowledges Father Hartke's Order, it fails to state that Father Hartke ever indicated in any manner to her that he received the Dress and considered it to be his own, or that he held the Dress from the early 1970s until his death, ***contrary to his vows***, in order to give it to her, or to the Hartke family. Ex. 3.   Third, Petitioner's "Certification" is devoid of any indication that the prior owner of the Dress, Ms. McCambridge, provided any indication that she had intended, by her gift, anything other than the ultimate disposition of the Dress.

Petitioner's Petition fails to assert a valid basis to support reopening Father Hartke's Estate, particularly as it has been closed for 35 years.

### B. PETITIONER'S ATTEMPT TO MAKE A CLAIM AGAINST THE PERSONAL REPRESENTATIVE IS TIME-BARRED.

Assuming *arguendo*, that somehow Petitioner has or ever had standing to assert a claim, her claim is long since barred by applicable statutes of limitations.   That is, to the extent that Petitioner's Petition to Reopen could be construed as a claim against the Personal Representative, D.C. Code Ann. § 20-1303(a) (1981) sets forth the limitations for claims against a Personal Representative:

> *Proceedings against personal representative.* -- Unless otherwise barred, any claim of personal liability against a personal representative, except for fraud,[11] shall be barred one year from the date of distribution of all the assets and satisfaction of all known claims against the estate.

---

[10] Conveniently, the Amended Complaint itself fails to mention at all that Father Hartke was a member of the Order of Preachers, or even properly refer to him as "Father Gilbert V. Hartke, **O.P.**" *Id*

[11] Pursuant to D.C. Sup. Ct. Civ. R. 9, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Petitioner has not plead any fact—much less facts with particularity—to establish fraud, either in the SDNY Case, or in the present case.

D.C. Code Ann. § 20-1303(a) (1981).   In this case, *there were no assets to distribute*.   As the Inventory schedule indicates, the only "asset" of the estate was Father Hartke's name rights, the right of ownership to which had been resolved in favor of the University via an order entered in a civil action on June 30, 1986.  Ex. 2 at 000080.   Because there were no assets to distribute, the assets should be deemed to have been "distributed" as of January 21, 1987, when counsel for the Estate filed the Inventory reporting no assets.[12]

As stated previously, this Court may take judicial notice of its own records. *Harrison*, 76 A.3d at 833. Because this case has been closed for decades and without having alleged any supporting facts, Petitioner cannot expect to be allowed to reopen the Estate based on any claim of fraud.

Petitioner seeks to reopen the estate and conduct "subsequent administration" pursuant to D.C. Code § 20-1304. However, these efforts are barred by the last sentence of § 20-1304, which states: "Any further proceedings shall be conducted pursuant to the applicable provisions of this title, *but no claim previously barred may be asserted in the subsequent administration*." D.C. Code Ann. § 20-1304. (Emphasis added). Having failed to have asserted any claims in the prior administration proceedings or within any limitations period thereafter, any claims by Petitioner are now time barred and cannot serve as a basis for reopening the Estate.

Assuming for sake of argument that the Estate might be reopened to name a new Personal Representative in order to pursue the Dress as an asset of the Estate, any attempt to recover from the University for alleged conversion or possible replevin, would be long since barred under D.C.'s three-year statute of limitations governing any such action. See D.C. Code § 12–301 (8).

---

[12] Termination of the Personal Representative's appointment pursuant to D.C. Code Ann. § 20-1301 (1981) would have required the Court's approval of a Final Account or an Order from the Court terminating such appointment.

The same would be true with respect to any potential declaratory relief that the Estate owns the Dress or that the University was somehow "negligent" by allegedly failing to follow its philanthropic gift policy in accepting the gift of the Dress.[13] Any and all such claims are time-barred. Reopening the Estate would therefore be futile. The Petition to Reopen should be denied on this basis.

Petitioner's Amended Complaint asserts common law claims for conversion, and "breach of duty to exercise reasonable care" or negligence (in arriving at the decision to auction the Dress in New York, and allegedly violating the University's own policy regarding philanthropic gifts.)[14]

### C. LACHES BARS ALL CLAIMS THAT SEEK TO CHALLENGE THE UNIVERSITY'S RIGHTFUL OWNERSHIP OF THE DRESS.

A defense of laches has two elements: an unreasonable and unexplained delay by one party, and prejudice to the other party resulting from the delay. *Schmittinger v. Schmittinger,* 404 A.2d 967, 970 (D.C.1979); *American University Park Citizens Ass'n v. Burka,* 400 A.2d 737, 740 (D.C.1979); *Amidon v. Amidon,* 280 A.2d 82, 84 (D.C.1971) (citing cases). When actual fraud is involved, such as Petitioner alleges in the SDNY Case, "relief will be barred where the delay has worked to the disadvantage of the defendant." *Interdonato v. Interdonato,* 521 A.2d 1124, 1137 (D.C. 1987).

Petitioner has not, and cannot, under any circumstances, reasonably establish that she acted with vigilance in pursuing her claims after at least 36 years of inaction from and after being provided legal notice of the opportunity to make any claims. The timing of Petitioner's greatly belated claims significantly disadvantages the University if forced to rebut the allegations. For

---

[13] Petitioner's Amended Complaint asserts common law claims for conversion, and "breach of duty to exercise reasonable care" or negligence (in arriving at the decision to auction the Dress in New York, and allegedly violating the University's own policy regarding philanthropic gifts.) With such a claim, Petitioner must necessarily concede that the Dress was a gift to the University, thereby defeating her claim.

instance, given the inordinate delay, Ms. McCambridge, the central figure with potentially relevant evidence has been dead and gone for nearly 20 years.[15]

and should therefore by denied with prejudice.

## III.    CONCLUSION

The Court should grant Catholic University's Motion to Intervene, and, for all the reasons stated, find that the Petition to Reopen would be futile, and, consequently, deny the Petition to Reopen with prejudice.

Dated: September 20, 2022                         Respectfully submitted,

                                                  OFFIT KURMAN, P.A.

                                                  By: _____
                                                  Thomas W. Repczynski, DC Bar # 458766
                                                  8000 Towers Crescent Drive, Suite 1400
                                                  Tysons Corner, VA  22182
                                                  Telephone: (703) 745-1801
                                                  Facsimile:  (703) 745-1835
                                                  trepczynski@offitkurman.com

                                                  and

                                                  Eric Pelletier, DC Bar #454794
                                                  7501 Wisconsin Ave, Suite 1000W
                                                  Bethesda, MD 20814
                                                  Email: epelletier@offitkurman.com
                                                  Telephone: (240) 507-1739
                                                  Fax: (240) 507-1735
                                                  *Counsel for The Catholic University of America*

---

[15] The Court may take judicial notice that Ms. McCambridge passed away nearly 20 years ago on March 2, 2004. *See* https://usatoday30.usatoday.com/life/people/ 2004-03-17-mercedes-mccambridge_x.htm.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2022, a copy of the forgoing is being served upon the following counsel of record:

Anthony Scordo, Esq.
Anthony Scordo, Esq. PC
1425 Pompton Avenue, Suite 2-2
Cedar Grove, NJ 07009
Phone Number: (973) 837-1861
Fax Number: (973) 837-9650
anthonyscordo@msn.com
*Counsel for Barbara A. Hartke*

Thomas W. Repczynski

4858-0241-6942, v. 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

BARBARA ANN HARTKE, an individual
on her own behalf and on behalf of the Estate
of decedent Gilbert V. Hartke


*Plaintiff,*

v.

BONHAMS & BUTTERFIELD'S
AUCTIONEERS CORPORATION, A
DELAWARE CORPORATION; *THE*
CATHOLIC UNIVERSITY OF AMERICA,
A NON-PROFIT DISTRICT OF
COLUMBIA CORPORATION

*Defendants.*

Civil Action No.: 1:22-cv-03571-PGG

FIRST AMENDED VERIFIED  COMPLAINT

## NATURE OF ACTION

Plaintiffs Barbara Ann Hartke, individually and on behalf of the Estate of Gilbert V. Hartke, deceased, complains of Defendants Bonham's & Butterfield's Auctioneers Corporation and The Catholic University of America seeking equitable relief and damages.

## THE PARTIES

1. Plaintiff Barbara A. Hartke is a citizen of the State of Wisconsin, residing at 705 S. Lakeshore Drive, Apt. 2H, Lake Geneva WI 53147. She was the niece of and heir to the Estate of one Gilbert V. Hartke, deceased.

2. Defendant Bonhams & Butterfields Auctioneers Corporation (Bonham's) is, upon information and belief, a Delaware corporation duly qualified to do business in the State of



EXHIBIT
1

New York, County of New York with its principal place of business located at 580 Madison
Avenue, New York NY 10022.

3. Defendant The Catholic University of America (Catholic University) is, upon information
   and belief, a nonprofit Washington, D.C. corporation, operating as an institution of higher
   learning located at 620 Michigan Avenue, N.E. Washington, DC 20064 and organized for
   charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the
   Internal Revenue Code.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1322(a)(1) because the
   plaintiff is a citizen in the State of Wisconsin residing in the State of Wisconsin and
   defendant Bonham's is a corporation incorporated in the State of Delaware with its principal
   place of business located in the State of New York; defendant Catholic University is a non-
   profit corporation located in the District of Columbia, the matter in controversy exceeds the
   sum of $75,000.00, exclusive of costs and interest, and the parties herein are citizens of
   different States.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391 because defendant Bonham's has
   its principal place of business in the State of New York, resides within the Southern District
   of New York, and a substantial part of the events or omission and damages giving rise to this
   action are occurring in this District.

## INTRODUCTION

6. Plaintiff files this action seeking to immediately halt Defendant's auction of property that
   belongs to the Estate of Gilbert V. Hartke, deceased. Plaintiff is the niece and closest living
   heir of the late Gilbert V. Hartke (decedent) who passed away in the District of Columbia on

February 21, 1986. Sometime in July, 1986, the College of the Immaculate Conception (the College), 487 Michigan Avenue, NE, Washington DC 20017, on behalf of one Joseph P. Allen, O.P., Treasurer of the College the self described "largest creditor of the decedent" applied to be appointed personal representative of the decedent's estate pursuant to D.C. Code §20-303 in Petition docketed 1986 ADM 001663. According to Allen, decedent died intestate. Decedent's only personal property listed in the petition was as follows:

> The right to publicize the decedent's name, reference paragraph six of order entered June 30, 1986 in The Catholic University of America et. Al. v. Katherine Faith Prior, et. Al, Superior Court of District of Columbia Civil Action #3675-86.

Upon information and belief, decedent had in his possession substantial property at his death and the statement of Allen that there was no other personalty than that listed above was false, fraudulent amounting to perjury, or at the very least, reckless disregard for the truth. No other personal property of decedent was listed on this purported inventory. The estate was, upon information and belief closed, as there were no reported assets.

7. This Complaint arose out of an advertisement by Bonham's indicating that an auction is scheduled to take place on May 24, 2022 at 10:00 AM PDT of "An Important Costume worn by Judy Garland as Dorothy in the Wizard of Oz." M.G.M. Designed by Adrian. According to the advertisement on Bonham's website:

> The dress worn by Judy Garland as Dorothy Gale throughout the scene set in the Witch's Castle, when the Wicked Witch of the West [Margaret Hamilton] has captured Dorothy and threatened her with death.
> Comprising a blue and white gingham pinafore dress with a fitted bodice and a full skirt, with handkerchief pocket, two mother of pearl buttons in the front and two to the reverse, wit a hook and eye closure at the back with fabric label in side inscribed 'JUDY GARLAND 4223' with a short sleeved blouse of cram organdy with a high neck trimmed at the neck and cuffs with pale blue rickrack trim, the blouse with hook and eye closure to the neck and snap closure to the body.
>
> Provenance

Mercedes McCambridge
The Catholic University of America

The website states $800,000-$1,200,000 in describing the dress, apparently estimating the successful bid. Upon information and belief, said figures underestimate the actual selling price.

8. This action challenges defendants' false claim that the Important Costume ("dress") advertised on the Bonham's website to be auctioned has the provenance, i.e. originates with or has an earliest known history with. solely, the late Mercedes McCambridge and Catholic University. This claim is false because, while at one point McCambridge was the owner of the dress, McCambridge specifically and publicly gave the aforesaid dress to decedent Gilbert V. Hartke and said dress was at the time of his death and remains an asset of decedent's estate.

9. Upon information and belief, the dress was missing for decades and relocated in 2021 with decedent's belongings in a storage location on the Catholic University campus where decedent, a Roman Catholic priest, was long employed as a University Professor and Drama Department Chairman. Catholic University apparently has made no attempt to locate decedent's heirs since the dress was relocated. Catholic University has no ownership interest in the dress as, upon information and belief, there is no documentation demonstrating that decedent ever formally or informally donated the dress to Catholic University.

10. McCambridge was a star in her own right and appeared in numerous films and television shows. McCambridge had a *personal relationship* with Hartke that was only tangentially related to his position at Catholic University. McCambridge credited Hartke for helping her battle alcohol and substance abuse. She was obviously a close confidant of Judy Garland and the gift of the dress to Gilbert V. Hartke was to thank Hartke for his counselling and support.

McCambridge later founded and ran an organization for the treatment of alcoholism and substance abuse for many years.

11. Plaintiff as rightful heir of decedent on her own behalf and on behalf of any other living and rightful heirs of his Estate here seeks this court's intervention to immediately grant a temporary restraining order and/or a preliminary injunction enjoining Bonham's from continuing the auction in order to prevent irreparable harm that will result if the dress is transferred to unknown buyers.

12. Upon information and belief, the dress is at the time of the filing of this Complaint physically located in this District at Bonham's place of business, 580 Madison Avenue, New York NY. Plaintiff now seeks immediate return of the dress to the Estate of Gilbert V. Hartke. In the alternative, Plaintiff respectfully requests that this court enjoin either or both defendants from transferring the dress out of this district unless and until the rights of the parties are adjudicated.

13. The dress has great and substantial sentimental value to plaintiff, is unique, and is recognized worldwide as an iconic image of perhaps the most beloved and watched film in the history of cinema. Ms. Garland, the late actress who wore the dress in the film is, of course, immortal and still has millions of admirers and devoted fans throughout the world.  Her character, Dorothy was and to this day remains a heroine of young girls everywhere.  The property is priceless and defendants' conversion of same has caused and continues to cause great emotional harm to the plaintiff as the closest living heir of Gilbert V. Hartke.

14. Father Gilbert V. Hartke, was, in his own right, a famous public figure, close to Presidents, First Ladies, Hollywood stars and political and public figures worldwide. His contributions to the University, the world of drama and to the District of Columbia community are still

recognized and honored decades after his passing. The temerity of defendants in failing to honor his memory and ignore his legacy is insulting and distressing to the plaintiff and other living heirs.

15. Plaintiff Barbara Ann Hartke, like her uncle, pursued a lifelong career in the field of educating young minds and is a retired Chicago school teacher.

16. Defendants failed to employ due diligence, or, for that matter, any diligence at all in attempting to locate the heirs of Gilbert V. Hartke and advise them of the finding of the dress and their intent to sell it without any compensation to its rightful owners.

17. On or about June 13, 2022, plaintiff applied in the Superior Court of the District of Columbia, Probate Division, to reopen the Estate and to succeed Allen as personal representative as a new asset of the asset had been discovered, namely the subject dress.

## FIRST CAUSE OF ACTION

## CLAIM SEEKING DECLARATORY RELIEF

18. Plaintiffs hereby incorporate by this reference paragraphs 1 through 11 above as if set forth fully herein.

19. In a case of actual controversy within its jurisdiction, any court of the United States "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 USC § 2201(a).

20. An actual controversy exists between the Parties in this case with respect to the title to the dress which is referenced and described above.

21. It is necessary and proper that the rights and status among the parties hereto be declared, including with respect to the parties' interests in the Property.

22. Plaintiff seeks a declaration of rights, including a declaration that the right to possession of the dress by the Estate of Gilbert V. Hartke is valid, enforceable, and superior to any claim of defendants.

23. The dress is not for sale or for release into commerce, and hence there is no monetary remedy that can restore the right to possession to Estate of Gilbert Hartke other than a declaration by this court of its rights to the property and the return of the property to the Estate of Gilbert V. Hartke.

24. There is no alternative, adequate remedy at law to restore the parties to the *status quo ante*.

## SECOND CAUSE OF ACTION

## CLAIM FOR CONVERSION AND RETURN OF PERSONAL PROPERTY

25. Plaintiff hereby incorporate by this reference paragraphs 1 through 18 above as if set forth fully herein.

26. At all times herein mentioned plaintiffs were, and still are, the owners and were, and still are, entitled to the possession of certain property as described heretofore that were converted by the defendants for their own use.

27. As a direct and proximate cause of the defendant's conversion of the plaintiffs' property, plaintiff has suffered damages, the full nature and extent of which are presently unknown, but which will be determined according to proof at trial.

## THIRD CAUSE OF ACTION

## CLAIM FOR FALSE ADVERTISING
### (Lanham Act, 15 USC § 1125(a))

28. Plaintiffs hereby incorporate by this reference paragraphs 1 through 21 above as if set forth fully herein.

29. Bonham's website statements pertaining to the provenance of the dress have been published by Bonham's and used as commercial advertisement or promotion for the advertised products.

30. Said statements are false and intended to harm plaintiff and the Estate of Gilbert V. Hartke by implying that the defendants have title and ownership to the property.

## FOURTH CAUSE OF ACTION

## INJUNCTION

31. Plaintiffs hereby incorporate by this reference paragraphs 1 through 24 above as if set forth fully herein.

32. Defendants' false statements and illegal attempts to sell the Estate of Gilbert V. Hartke's property have caused and are likely to continue to cause competitive or commercial injury.

33. The Estate of Gilbert V. Hartke is being irreparably harmed by defendants' unlawful actions and plaintiff is entitled to an injunction prohibiting defendant from selling property of the Estate of Gilbert V. Hartke including but not limited to the described dress.

34. Plaintiff has no adequate remedy at law that will compensate for the continued and irreparable harm she and, or the Estate of Gilbert V. Hartke will suffer if the dress is transferred outside of this District and, or the scheduled auction is permitted to continue.

## FIFTH CAUSE OF ACTION

## BREACH OF DUTY TO EXERCISE REASONABLE CARE

35. Plaintiffs hereby incorporate by this reference paragraphs 1 through 33 as if fully set forth herein.

36. Defendant Catholic University of America, its agents, employees, principals, officers, and directors, including members of the bar, designated compliance officers, and    failed to

exercise even the least modicum of reasonable diligence and care and acted in reckless disregard of the rights of plaintiff and the other heirs in arriving at the decision to place the aforesaid dress with Bonham's for auction. Said decision was arrived at and acted upon in clear and obvious violation of defendant's own internal policies including a detailed policy for Acceptance, Management and Disposition of Philanthropic Gifts.

37. As a result of defendant Catholic University of America's actions, plaintiff experienced severe emotional distress by being forced to litigate in a foreign jurisdiction miles from her home without warning and notice;

**WHEREFORE** plaintiff prays for judgment against the defendants as follows:

  a. Defendants and all agents, servants, employees and attorneys and all other persons in active concert or participation with it who receive actual notice of the injunction be temporarily, preliminarily and permanently enjoined from transferring to anyone other than plaintiff and, or the Estate of Gilbert V. Hartke the dress advertised on Bonham's website, or moving said dress outside of this District;

  b. Plaintiff and, or the Estate of Gilbert V. Hartke be awarded compensatory and exemplary damages and restitution for the wrongful conversion of their property by defendant Catholic University of America;

  c. Plaintiff and, or the Estate of Gilbert V. Hartke be awarded compensatory and exemplary damages for damages incurred as a result of defendants' gross and reckless, and negligent disregard for the property rights of plaintiff and the Estate of Gilbert V. Hartke;

  d. Plaintiff be awarded reasonable attorneys' fees and costs of suit.

Dated:  6/21/2022

s/Anthony Scordo
Anthony Scordo
Attorney for Plaintiff Barbara Ann Hartke,
Individually and on behalf of the Estate of Gilbert
V. Hartke, deceased

## VERIFICATION OF COMPLAINT

Barbara Ann Hartke, of full age, says:

1. I am the Plaintiff in the foregoing Verified Complaint.
2. The allegations therein are true to my personal knowledge.
3. I certify the above-mentioned statements are true. I realize if the above statements
   are willfully false, I am subject to punishment.

Barbara Ann Hartke

Dated:  Tues. 6/21/22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BARBARA ANN HARTKE, an individual
on her own behalf and on behalf of the Estate
of decedent Gilbert V. Hartke

    Plaintiff,

  v.

BONHAM'S & BUTTERFIELD'S
AUCTIONEERS CORPORATION, A
DELAWARE CORPORATION; THE
CATHOLIC UNIVERSITY OF AMERICA,
A NON-PROFIT DISTRICT OF
COLUMBIA CORPORATION
Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.: 22-cv-03571-PGG

*District Judge: Hon. Judge Paul G. Gardephe*
*Magistrate:  Hon. Valerie Figueredo*

## DEFENDANT CATHOLIC UNIVERSITY OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION WITH TEMPORARY RESTRAINING ORDER

Shawn A. Brenhouse
Amin Al-Sarraf (*pro hac vice admission pending*)
LOCKE LORD LLP
*Attorneys for Defendant Catholic University of America*
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
shawn.brenhouse@lockelord.com
amin.alsarraf@lockelord.com

EXHIBIT
2

**BATES 000001**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    Father Gilbert V. Hartke, O.P. ..................................................................................3

    B.    The Donation of the Dress to the University ............................................................5

    C.    Catholic University's Uninterrupted Possession of the Dress ..................................6

    D.    Estate Proceedings and the Dominican Order ..........................................................7

    E.    The Auction and Plaintiff's Lawsuit........................................................................8

ARGUMENT ..........................................................................................................................9

    A.    Legal Standard .........................................................................................................9

    B.    Plaintiff Is Not Entitled To Any Relief Here Because She Has No Standing ..............10

        1.    The Complaint Fails to Sufficiently Demonstrate, Either on its Face or By the Facts Presented, that Plaintiff Has Any Ownership Interest in the Dress; It Is Not Reasonably in Dispute that Ms. McCambridge Donated the Dress to the University........................................................................................................11

        2.    The Dominican Order – the Only Entity that Might Theoretically Have Standing Here – Disclaims Ownership of the Dress and Supports the University's Ownership and Intended Auction of the Dress........................................................................14

    C.    Plaintiff Fails to Satisfy the Requirements for a Preliminary Injunction.......................15

        1.    Plaintiff is unlikely to succeed on the merits ...........................................................15

        2.    Plaintiff cannot demonstrate irreparable harm........................................................17

        3.    The balance of equities weighs in favor of the University .........................................18

        4.    The proposed injunction would disturb important public interests ............................19

    D.    If Any Form of Relief is Granted, the Court Should Require a Bond in Accordance With Fed. R. Civ. P. 65(c). ......................................................................................20

CONCLUSION.......................................................................................................................22

**BATES 000002**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
436 F.3d 82 (2d Cir. 2006)...........................................................................1, 12

*Amidax Trading Group v. S.W.I.F.T. SCRL,*
671 F.3d 140 (2d Cir. 2011)...................................................................................11

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009)...........................................................................................11

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................................10, 11

*Bender v. Rochester,*
765 F.2d 7 (2d Cir. 1985)..........................................................................................4

*Block v. Fisher,*
103 A.2d 575 (D.C. 1954) .......................................................................................16

*Bronx Household of Faith v. Bd. of Educ. of City of New York,*
331 F.3d 342 (2d Cir. 2003)....................................................................................10

*Cacchillo v. Insmed, Inc.,*
638 F.3d 401 (2d Cir. 2011)......................................................................................9

*Carter v. Carter,*
516 A.2d 917 (D.C. 1986) .......................................................................................17

*Classis of Central California v. Miraloma Community Church,*
99 Cal. Rptr. 3d 449 (Cal. App. 1st Dist. 2009) ....................................................13

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.,*
790 F.3d 411 (2d Cir. 2015)....................................................................................10

*Day v. Case Credit Corp.,*
2007 U.S. Dist. LEXIS 12465, 2007 WL 604636 (E.D. Ark. February 22,
2007) .......................................................................................................................16

*Doctor's Assocs., Inc. v. Stuart,*
85 F.3d 975 (2d Cir. 1996).......................................................................................20

*eBay v. MercExchange, L.L.C.,*
547 U.S. 547 U.S. 388, 391 (2006)..........................................................................10

**BATES 000003**

*Ferguson v. Tabah,*
    288 F.2d 665 (2d Cir. 1961) ..................................................................................20

*Golden Krust Patties, Inc. v. Bullock,*
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ...................................................................20

*Greenpeace, Inc. v. Dow Chem. Co.,*
    97 A.3d 1053 (D.C. 2014) ....................................................................................16

*Hall v. Schoenwetter,*
    686 A.2d 980 (Conn. 1996) ..................................................................................16

*Hanson Trust PLC v. ML SCM Acquisition, Inc.,*
    781 F.2d 264 (2d Cir. 1986) ...................................................................................9

*Hill v. Lappin,*
    2012 U.S. Dist. LEXIS 91895, 2012 WL 2590476 (E.D. Ky. July 3, 2012) ............3

*Int'l Controls Corp. v. Vesco,*
    490 F.2d 1334 (2d Cir. 1974) ...............................................................................21

*Interlink Int'l Fin. Servs. V. Block,*
    145 F. Supp. 2d 312 (S.D.N.Y. 2001) ...................................................................21

*Keepers, Inc. v. City of Milford,*
    807 F.3d 24 (2d Cir. 2015) .....................................................................................9

*Lujan v. Nat'l Wildlife Fed'n (Lujan I),*
    497 U.S. 871 (1990) ................................................................................................9

*Lusk v. Vill. of Coldspring,*
    475 F.3d 480 (2d Cir. 2005) .................................................................................10

*Maddox v. Bank of N.Y. Mellon Trust Co., N.A.,*
    19 F.4th 58 (2d Cir. 2021) ...................................................................................10

*Maine v. Adams,*
    672 S.E.2d 862 (Va. 2009) ...................................................................................16

*Mantena v. Johnson,*
    809 F.3d 721 (2d Cir. 2015) ...................................................................................9

*Medical Soc'y of the State of New York v. Toia,*
    560 F.2d 535 (2d Cir. 1977) ...................................................................................9

*Melendez v. City of New York,*
    16 F.4th 992 (2d Cir. 2021) .................................................................................11

**BATES 000004**

*Montero v. City of Yonkers,*
    890 F.3d 386 (2d Cir. 2018).................................................................................11

*Munaf,*
    553 U.S. at 689-90 ..........................................................................................9

*Nokia Corp. v. InterDigital, Inc.,*
    645 F.3d 553 (2d Cir.2011).................................................................................20

*Order of St. Benedict v. Steinhauser,*
    234 U.S. 640 (1914)...................................................................................13, 14

*Ricard v. Williams,*
    20 U.S. (7 Wheat.) 59 (1822)..............................................................................16

*Rodriguez ex rel. Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999)...............................................................................10

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010)............................................................................10, 18

*SEC v. Citigroup Global Mkts., Inc.,*
    673 F.3d 158 (2d Cir. 2012)...............................................................................19

*Tutor Time Learning Ctrs., LLC v. KOG Indus.,*
    2012 U.S. Dist. LEXIS 162124, 2012 WL 5497943 (E.D.N.Y. November 13,
    2012) ......................................................................................................19

*Wash. Univ. v. Catalona,*
    437 F. Supp. 2d 985 (E.D. Mo. March 31, 2006) ........................................................12, 13

*Willcox v. Stroup,*
    467 F.3d 409 (4th Cir. 2006) ..............................................................................16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).....................................................................................3, 18

**Statutes and Rules**

D.C. Code § 19–309.............................................................................................17

D.C. Code § 19–310.............................................................................................17

D.C. Code § 20–1303............................................................................................15

Fed. R. Civ. P. 65(c) .......................................................................................20, 21

**BATES 000005**

**Treatises and Commentary**

11A Wright-Miller-Kane, Federal Practice and Procedure (2d ed. 1994)......................................21

**BATES 000006**

Defendant the Catholic University of America (the "University") submits this Memorandum of Law in Opposition to Plaintiff Barbara Ann Hartke's ("Plaintiff") Motion for a Preliminary Injunction with Temporary Restraining Order (the "Motion"), and states as follows:

## INTRODUCTION

In 1973, Ms. Mercedes McCambridge, a renowned actress, gave a dress and underlying blouse that was worn by Judy Garland in the "Wizard of Oz" (the "Dress") to Father Gilbert V. Hartke, O.P., then-Chair of the drama department at Catholic University and a Roman Catholic priest of the Dominican Order. *See* Dkt. 1; Complaint ("Compl.") ¶¶ 8-9. Overwhelming, incontrovertible evidence, including contemporaneous accounts, establish that the Dress was given to Father Hartke for the benefit of the students in the drama department, and was kept in the department until earlier this year, nearly 50 years after Father Hartke retired.

In this action, Plaintiff Barbara Ann Hartke claims that the Dress was given to Father Hartke, her now-deceased uncle, and accepted by him, in his personal capacity. And that, as a result, she and other heirs of his estate own the Dress. She now seeks a preliminary injunction to prevent the Dress from being sold at auction by the University.

Plaintiff is not entitled to the "extraordinary and drastic" remedy of a preliminary injunction for at least the following reasons:

(1) she has no standing to bring her claims or seek an injunction because she fails to present sufficient allegations and facts to support her assertion that she has an ownership interest in the Dress;

(2) she is unlikely to succeed on the merits of the claim, including because: (a) *all* of the contemporaneous evidence related to the gift by Ms. McCambridge demonstrates that Ms. McCambridge intended to give the Dress to Father Hartke for the benefit of the students at the University's drama department, and not for his personal use or ownership; (b) Father Hartke could

1

not have taken personal ownership of the Dress as a priest of the Dominican Order because he signed the following vow upon entering the Order: "I do render myself incapable of possessing temporal goods as my own or of using them with a private right, so any contrary act, i.e., any act of receiving, retaining, selling, giving, exchanging, profiting, etc. on my own authority is an act that is null and void;" and (c) Father Hartke maintained the Dress in the University's drama department until his retirement in 1974, and thereafter it remained at the University until it was sent to the auction house Bonhams & Butterfields ("Bonhams") earlier this year;

(3) Plaintiff cannot demonstrate irreparable harm from the auction and sale of the Dress she seeks to enjoin because she cannot show that the Dress would not otherwise be sold upon the resolution of this action—in fact, her claim to the estate can only be (at most) one-fifth, so to satisfy her interests, the Dress would need to be sold. Further, even if the estate had some interest in the Dress (it does not), an injunction would *hurt* Father Hartke's estate because other members of Father Hartke's family expressly support the sale of the Dress at auction as to benefit Catholic University's drama students[1];

(4) The balance of equities weigh in favor of the University given the significant efforts and resources expended to prepare for the auction and the lack of any compelling interests or likely harm to Plaintiff; and

(5) An injunction would disturb important public interests, including by encouraging plaintiffs to make meritless eleventh-hour challenges to cloud title on valuable items at auction

---

[1]    The proceeds from the sale of the Dress will support Father Hartke's legacy – his founding of the drama department at the University he long served. This dispute is not really about honoring Father Hartke's legacy, or the sentimental value placed on a Dress Plaintiff has never possessed. (*See* Compl. ¶¶ 13-14.) Plaintiff also cannot claim that she will personally retain the Dress given the number of Father Hartke's heirs. Plaintiff is simply seeking money and "compensation." Compl. ¶ 16 ("[The University's] intent to sell it without any compensation to its rightful owners").

BATES 000008

with a payout in mind, undermining the finality of legal proceedings (here, probate proceedings from more than 30 years ago that confirmed that Father Hartke had no personal possessions in his estate), overlooking the express, written wishes of a deceased individual who made clear how his possessions were to be disposed of, and challenging the solemn religious vows taken by Roman Catholic priests of the Dominican Order.

In short, Plaintiff presents no evidence or other reasonable basis to establish any entitlement to the Dress, no Article III injury-in-fact, and no other plausible grounds for the "extraordinary remedy" that is a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Accordingly, the Court should deny the Motion.

## STATEMENT OF FACTS

### A.    Father Gilbert V. Hartke, O.P. [2]

Father Gilbert V. Hartke, O.P., as the Complaint acknowledges, served as a professor and the University's drama department chair for several decades, leaving an enduring legacy in the world of drama.  *See* Compl. ¶¶ 9, 14.  Specifically, Father Hartke, who passed away in 1986, founded the University's drama department in 1937 and chaired it until his retirement in 1974.[3] As the chair, Father Hartke received many donations and leveraged his position to garner those

---

[2]     Father Hartke's status as a Dominican priest as denoted by the O.P. in his full name is public knowledge. (*See* Affidavit of W.J. Shepherd, Exhibit B (court filings in his probate action); Decl. Thomas Tso, Ex. A, Bart Barnes, *Fr. Gilbert Hartke Dies; Built Catholic U. Theater,* The Washington Post (Feb. 22, 1986), at B6 (his obituary); Decl. Thomas Tso, Ex. B, Hon. Constance A. Morella, "In Honor of Father Gilbert V. Hartke, O.P.," 135 Cong. Rec. 22458-459 (Oct. 4, 1989); *see generally Hill v. Lappin,* 2012 U.S. Dist. LEXIS 91895, *1 n.2, 2012 WL 2590476 (E.D. Ky. July 3, 2012) (taking judicial notice of the full name).
[3]     *See* Decl. Thomas Tso, Ex. A, Bart Barnes, *Fr. Gilbert Hartke Dies; Built Catholic U. Theater,* The Washington Post (Feb. 22, 1986), at B6.

BATES 000009

donations to support the University's drama program. *See* Affidavit of W.J. Shepherd, Exhibit E (example of a gift to Father Hartke).[4]

Serving as "a Roman Catholic priest," Compl. ¶ 9, was another critical component of Father Hartke's identity. Specifically, Father Hartke executed a Document of Renunciation of Temporal Goods on August 14, 1933 upon becoming a religious in the Dominican order. (*See* Affidavit of W.J. Shepherd, Exhibit B.)[5] The Document of Renunciation, which was filed in the probate proceedings, included two express vows that are critically relevant here: (1) "I do render myself incapable of possessing temporal goods as my own or of using them with a private right, so any contrary act, i.e., any act of receiving, retaining, selling, giving, exchanging, profiting, etc. on my own authority is an act that is null and void;" and (2) "Do declare that after solemn profession all goods which may in anyway accrue to me individually belong to the Order." *Id.*; *see also generally* Affidavit of Father LaToile (describing the practices of Dominican Roman Catholic priests).

Father Hartke was also a member of a large family, with six siblings. (*See* Affidavit of Margo Carper, Exhibit A). Five of his six siblings have descendants. *Id.* Plaintiff is a descendent of one of Father Hartke's brothers. *Id.* Descendants of two of Father Hartke's other siblings assert that if Father Hartke's estate possesses the Dress, then they would request a partition to use the

---

[4]    *See also* Decl. Thomas Tso, Ex. B, Pat Lewis, *Father Hartke – Washington's showbiz priest,* The Washington Star (May 7, 1979), at C-1, C-5.

[5]    These documents filed in court are subject to judicial notice. Specifically, these documents were filed in the probate proceeding in connection with Father Hartke's estate by the representative of the estate at that time—the then-Treasurer of the local Dominican Order, of which Father Hartke was a member. Plaintiff here is purporting to represent that same estate. *See* Decl. Thomas Tso, Ex. D, Docket Entry for probate proceedings in D.C. Superior Court, 1986 ADM 001663, *In re Gilbert V. Hartke*; Affidavit of W.J. Shepherd, Exhibits B-D (copies of filings from those proceedings); *see generally* <u>Bender v. Rochester, 765 F.2d 7, 12 (2d Cir. 1985)</u> ("The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries.").

**BATES 000010**

funds to support the drama department of the University.  (*See* Affidavit of Margo Carper; Affidavit of Thomas Kuiper).

**B.      The Donation of the Dress to the University**

In 1973, Mercedes McCambridge, a famous and award-winning actress, served as the actress-in-residence at the University.[6]  In early March 1973, Ms. McCambridge publicly handed over the Dress to Father Hartke on the University's Campus and thereafter conducted an interview with the student newspaper.  (*See* Affidavit of W.J. Shepherd, Exhibit F).  As the student newspaper article, published on March 30, 1973, reported, "Mercedes McCambridge presents Judy Garland's 'Dorothy Dress' *to the Speech and Drama department*." *Id*. at page 1 (emphasis added).  It also stated that Ms. McCambridge "recently presented Father Gilbert Harkte with Dorothy's dress from the 'Wizard of Oz' in hopes that the precious gift will be a source of hope, strength, and courage *to the students*."  *Id*. at page 7 (emphasis added).

The Washington Post, another contemporaneous source, confirms that Ms. McCambridge intended to donate the Dress to the University's drama department for the students. On March 1, 1973, The Washington Post wrote that "Mercedes McCambridge, actress-in-residence [sic] at Catholic University, has presented Judy Garland's Dorothy dress from the 'Wizard of Oz' *to the university*." *See* Decl. Thomas Tso, Ex. E ,Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1973), at H9 (emphasis added).

In 1979, The Washington Star, in an in-depth exclusive with Father Hartke reported that "[Father] Hartke must turn over all his paychecks to the Dominicans within 24 hours. All of the 90 or so Dominican Priests at Catholic University, including [Father] Hartke, are given $35 a month. Gifts (like the car) become the monastery's, the community's or the drama school's

---

6        Megan Rosenfeld, "College Theater's Ten Finalists," *The Washington Post, Times Herald*, at H9 (Mar 1, 1973) (attached to  "Decl." of Thomas Tso, Exhibit E).

**BATES 000011**

property (*which includes Judy Garland's dress in the Wizard of Oz* and much of Booth Luce's library.) The estate of Josephine McGarry Callan was turned over to Hartke to be used for Scholarships. He also inherited a 'six-figure income" to be invested for scholarships." *See* Decl. Thomas Tso, Ex. C, Pat Lewis, *Father Hartke – Washington's Showbiz Priest,* The Washington Star (May, 7, 1973), at C-5 (emphasis added).

**C.     Catholic University's Uninterrupted Possession of the Dress**

Since early March 1973, the Dress has never left the campus or the University's possession. Father Hartke did not take the Dress home nor, consistent with his vows, did he ever accept the Dress as his personal possession, instead intending to display the Dress on campus. *See* Decl. Thomas Tso, Ex. E, Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1979), at H9 ("Father Hartke is making plans to put the costume on display in the Hartke Theater."). Indeed, when Father Hartke retired, he left the Dress at the University. (*See* Affidavit of Professor Gail Beach). During a visit to Father Hartke's office, Father Hartke told a relative that the Dress was *for the University*. (*See* Affidavit of Thomas Kuipers). Likewise, when Father Hartke showed students the Dress, he told them that the Dress was donated *to the University*. (*See* Affidavit of William Largess).

Throughout the decades since the donation, staff at the University regularly saw the Dress in the offices of the drama department until around 2006. (*See* Affidavit of Professor Gail Beach; noting the University allegedly misplaced or "relocated" the Dress and found the Dress on campus; *see also* Compl. ¶¶ 9-10). The University had possession of the Dress for nearly 50 years, and until 2006 in the offices of the drama department. Plaintiff never made any inquiry about the Dress despite being "well aware of the gift of the Dress when it occurred in the 70s" (Compl. ¶ 15).

Contrary to the Plaintiff's "information and belief," (Compl. ¶ 9) that the Dress was found "with Father's belongings", the Dress was misplaced (within the University) from around 2006 to

**BATES 000012**

June 7, 2021 because of an office move. (*See* Affidavit of Professor Gail Beach).[7] Consistent with the University's decades of possession, the Dress was found by itself in a box with a note from a recently retired Professor and Chair of the Drama Department. (*See* Affidavit of Matthew Ripa).

### D.   Estate Proceedings and the Dominican Order

In 1986, the Treasurer of Father Hartke's local Dominican Order filed a petition to probate the estate of Father Hartke in the Superior Court of the District of Columbia. *See* Decl. Thomas Tso, Ex. D, Docket Entry for probate proceedings in D.C. Superior Court, 1986 ADM 001663, In re Gilbert V. Hartke; Affidavit of W.J. Shepherd, Exhibit D.   In that probate proceeding, the Treasurer served as the estate's personal representative, because the Order "is the largest creditor" of Father Hartke. *Id.* It was made clear in the petition, consistent with his vows of poverty, that Father Hartke had no will, no real property and no tangible personal property. *Id.* Father Hartke's only listed property was the "right to publicize the decedent's name[.]" *Id.* The Plaintiff was notified of the estate's representations but never made any claim. *Id.*[8] Months later, the personal representative, the Treasurer of the local Dominican Order, filed an inventory of the estate that did not list any tangible personal or real property. (*See* Affidavit of W.J. Shepherd, Exhibit C).  Despite being "well aware of the gift," Compl. ¶ 15, Plaintiff made no challenge to the inventory either. (*See* Affidavit of W.J. Shepherd, Exhibit C).

In a parallel lawsuit over ownership of Father Hartke's only property in his estate—the right to use his name—the D.C. court ruled that the Dominican Order (the College of the

---

[7]      In fact, the Plaintiff admits publicly that she does not know what was found with the Dress. *See* Decl. Thomas Tso, Ex. F, Kathianne Boniello, *Battle Looms over $1.5M "Wizard of Oz" dress found in storage closet,* The New York Post (May 18, 2022).

[8]      Unfortunately, the petition mislabeled the Plaintiff's familial relationship to Father Hartke, but notice was nevertheless sent to her address at the time. *See* Affidavit of W.J. Shepherd, Exhibit D, at 5.

**BATES 000013**

Immaculate Conception)[9] inherited Father Hartke's rights, consistent with his vows.   (*See* Affidavit of W.J. Shepherd, Exhibit A).  The Dominican Order does not assert any claims to the Dress and confirms the University's ownership. (*See* Affidavit of Father LaToile).

### E.    The Auction and Plaintiff's Lawsuit

After rediscovering the Dress in 2021, Catholic University decided to list it for auction to raise money for the University's drama department.  In an announcement made by the University on or about April 19, 2022, the school said:

"A dress worn by Judy Garland in her role as Dorothy in 'The Wizard of Oz' will be auctioned in Los Angeles on May 24, with the proceeds used to help establish a new film acting program at The Catholic University of America's Benjamin T. Rome School of Music, Drama, and Art."[10] Between 2021 and 2022, the University and co-defendant Bonhams & Butterfields Auctioneers Corp. ("Bonhams") expended significant resources to market, publicize, and organize the auction of the Dress for May 24, 2022, to support the University's drama department and its students.

After recent media coverage of the auction, Plaintiff filed her complaint (the "Complaint") in this action seeking equitable relief and damages from the University and co-defendant Bonhams.

While asserting in this action that the estate of Father Hartke owns the Dress, Plaintiff is conceding publicly that she has no idea who owns the Dress.[11]

Among many other problems with her allegations, at a minimum as a self-described "representative" of the estate, Plaintiff knew or should have known that Father Hartke was a fully-

---

[9]    Now called the Dominican House of Studies.

[10]    Decl. Thomas Tso, Ex. G, Catholic University, "Lost 'Dorothy Dress' to be Auctioned for New Catholic University Film Program" (April 19, 2022).

[11]    Plaintiff is quoted as saying: "I just want to know who has ownership over this ... I'd like to see the documentation." *See* Decl. Thomas Tso, Ex. F, Kathianne Boniello, *Battle Looms over $1.5M "Wizard of Oz" dress found in storage closet,* The New York Post (May 18, 2022).

BATES 000014

professed *Dominican* who could not accept gifts in his personal capacity and therefore could not own the Dress personally.

## ARGUMENT

### A.    Legal Standard

"When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990). Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot "rest on such 'mere allegations,' [as would be appropriate at the pleading stage] but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal citation omitted)." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). To establish Article III standing, a claimant must demonstrate: (1) an injury-in-fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that can likely be redressed by a favorable decision. *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015). "'The party invoking federal jurisdiction bears the burden of establishing prudential and constitutional standing.'" *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015).

A preliminary injunction is an "extraordinary and drastic remedy [and] never awarded as of right." *Munaf*, 553 U.S. at 689-90; *see also Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"); *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) (preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted"). Second Circuit precedent requires a party seeking a preliminary injunction or temporary restraining order to: "(1) demonstrate that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) likelihood of success on the merits or (b) sufficiently

BATES 000015

serious questions going to the merits for making them a fair ground for litigation, and a balance of hardship tipping decidedly in its favor." *See Lusk v. Vill. of Coldspring*, 475 F.3d 480, 485 (2d Cir. 2005) (internal quotation marks omitted). The court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay v. MercExchange, L.L.C.*, 547 U.S. 547 U.S. 388, 391 (2006). When a preliminary injunction would disrupt the status quo, rather than maintain it, a movant must satisfy "'an even higher standard of proof' by showing a 'clear' or 'substantial' likelihood of success." *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003); *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999). Finally, the Court must ensure that a preliminary injunction would not subvert the "public interest." *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

**B.   Plaintiff Is Not Entitled To Any Relief Here Because She Has No Standing**

Plaintiff asserts, simply, the "controversy [that] exists between the Parties in this case" is "with respect to the title to the dress[.]" Compl. ¶ 19. Plaintiff fails to plausibly establish an actual case or controversy under Article III. In order for her asserted controversy to exist, Plaintiff must plausibly assert or establish a right to the title to the Dress and injury-in-fact to that right to title. Plaintiff has not asserted, whether facially or factually, a plausible claim to the Dress's "title" on "which a cloud could settle." *See Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021) ("In short, the Maddoxes had no title on which a cloud could settle."); *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-19 (2d Cir. 2015).

As a facial matter, courts require "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. A

**BATES 000016**

complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). "The complaint's allegations, however must be 'plausible on [their] face,' a standard that 'asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (finding claim implausible where "obvious alternative explanation" for challenged conduct existed); *Melendez v. City of New York*, 16 F.4th 992, 1013 (2d Cir. 2021).

Here, the Complaint's assertion of ownership of the Dress is predicated on the purely speculative assertion that, in 1973, Mercedes McCambridge (who is deceased) intended to give the Dress to Father Hartke in his personal capacity and that he so accepted. Compl. ¶ 10. No factual enhancement was provided to support this assertion, including as to the intent behind this specific gift. Further, the Complaint ignores two obvious inferences: (1) Mercedes McCambridge gifted the Dress to Father Hartke as the University's representative, where he "was long employed as a University Professor and Drama," and Father Hartke accepted the Dress in that capacity, *see* Compl. ¶ 10; and, (2) even if McCambridge, as alleged, gifted the Dress to Father Hartke, in his personal capacity, Father Gilbert V. Hartke, O.P., a "Roman Catholic priest," *see* Compl. ¶ 9, was not able to accept gifts in that capacity, or to pass them on as personal property in his estate (indeed he had no estate per se).

      **1.**    **The Complaint Fails to Sufficiently Demonstrate, Either on its Face or By the Facts Presented, that Plaintiff Has Any Ownership Interest in the Dress; It Is Not Reasonably in Dispute that Ms. McCambridge Donated the Dress to the University**

"[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading*

**BATES 000017**

*Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-147 (2d Cir. 2011). Here, Plaintiff asserts

conclusorily that "the gift of the dress to Gilbert V. Hartke was to thank Hartke for his counseling,"

Compl. ¶ 10. Devoid of any facts or evidence supporting this statement, the Complaint ignores the

facts and evidence in the auction description itself (referenced and incorporated into the complaint

at Compl. ¶ 7).[12] The auction description references a contemporaneous newspaper article

memorializing McCambridge's intent: "The gift was recorded in an article at the time for the

University newspaper, Tower, published March 30, 1973." Decl. Thomas Tso, Ex. H, Bonhams,

"An Important Costume worn by Judy Garland as Dorothy in The Wizard of Oz." The article itself

states, that "Mercedes recently presented Father Gilbert Hartke with Dorothy's dress from 'The

Wizard of Oz' in hopes: that the precious gift will be a source of hope, strength, and courage to

the students." Affidavit of W.J. Shepherd, Exhibit F, p. 7.

Even apart from the facial challenge, Plaintiff fails to identify facts that McCambridge gave

Father Hartke the Dress in his personal capacity and that Father Hartke so accepted. Instead,

Plaintiff's assertions made upon "information and belief," which are insufficient. *See All. For*

*Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 86 n.4 (2d Cir. 2006) ("Article III

standing needs to be established, not merely pleaded, in order to give a federal court the authority

to exercise federal question jurisdiction."). Plaintiff's claim of "an inter vivos gift" "requires

donative intent, delivery, and acceptance." *Wash. Univ. v. Catalona*, 437 F. Supp. 2d 985, 998

(E.D. Mo. March 31, 2006). Contemporaneous evidence of the intent and other elements are

---

[12]     Plaintiff's Complaint only includes a portion of the description on Bonhams' website.
Compl. ¶ 7; *See* Bonhams' full description, Decl. Thomas Tso, Ex. H, Bonhams, "An Important
Costume worn by Judy Garland as Dorothy in The Wizard of Oz." The referenced description also
includes a reference to the *Tower* article which can be found at Affidavit of W.J. Shepherd, Exhibit
F.

**BATES 000018**

dispositive. *Id.* Here, the contemporaneous evidence as to the intent behind this *specific* gift all support the record in the publication the *Tower*: that Ms. Mercedes gave this gift to the University for its students. Affidavit of W.J. Shepherd, Exhibit F. A contemporaneous Washington Post article reported the same intent. (*See* Decl. Thomas Tso, Ex. E, Megan Rosenfeld, *College Theater's Ten Finalists,* The Washington Post (Mar. 1, 1973) at H9). Father Hartke's conduct and statements post-donation support that intent and the University's nearly 50 years of ownership and possession confirms the intent. (*See* Affidavit of Professor Gail Beach; Affidavit of Bill Largess; Affidavit of Thomas Kuipers; Decl. Thomas Tso, Ex. C, Pat Lewis, 'Father Hartke – Washington's Showbiz Priest', *The Washington Star* (May, 7, 1973) at C-5.) Plaintiff presents no contrary contemporaneous facts or evidence as to this specific gift.

Plaintiff also ignores a crucial element: Father Hartke's acceptance of that gift as his personal possession. The court may take judicial notice of Father Hartke's full name and his estate records that indicate he is a fully-professed *Dominican* – records that Plaintiff knows or should know as a putative representative of the estate. (*See e.g.,* Affidavit of W.J. Shepherd, Exhibit B). Father Hartke took vows that he would not accept gifts in his personal capacity and would have treated such a gift as void. *See Order of St. Benedict v. Steinhauser*, 234 U.S. 640 (1914) (enforcing these vows as "contract"). The rules of the Dominican Order explicitly reject any acceptance of property in a priest's *personal* capacity. (*See* Decl. Thomas Tso, Ex. I, Dominican Friars, Province of St. Joseph, Rule of St. Augustine, Chapter 1.3 ("Do not call anything your own; possess everything in common"); *see generally Classis of Central California v. Miraloma Community Church*, 99 Cal. Rptr. 3d 449, 453 (Cal. App. 1st Dist. 2009) (taking judicial notice of church rules).[13] Father Hartke did not accept other gifts in his personal capacity, consistent with

---

[13]     *See also* Affidavit of Father LaToile.

BATES 000019

the inventory of the estate conducted in 1987, listing nothing of value in personal possessions or any tangible property of any sort, despite documented gifts to Father Hartke over the years. (*See* Affidavit of W.J. Shepherd, Exhibits C, D, and E). Based purely on the facts, as alleged, the complaint does not plausibly allege the plaintiff has title to the Dress.

Plaintiff's Complaint has limited factual assertions. However, the incorporated documents, the contemporaneous records, and judicially noticeable court and church documents all point to the obvious explanation that Ms. McCambridge donated the Dress to Father Hartke as a representative of the University for the benefit of the University's drama students. He accepted the donation only in that capacity consistent with Father Hartke's vows.

> **2.    The Dominican Order – the Only Entity that Might Theoretically Have Standing Here – Disclaims Ownership of the Dress and Supports the University's Ownership and Intended Auction of the Dress**

In the probate proceedings related to the estate of Father Hartke, the representative of the estate at that time was the College of Immaculate Conception (Dominican Order). (*See* Affidavit of W. J. Shepherd, Exhibit D). In those proceedings, the probate court recognized that Father Hartke had vowed that all goods that "may in anyway accrue to [him] individually belong to the Order[.]" (Affidavit of W.J. Shepherd, Exhibit B). And, that no personal or real property passed into his estate consistent with these vows and despite well-known gifts to him over the years. (Affidavit of W.J. Shepherd, Exhibits C, E). The only obvious and reasonable explanation is that, consistent with his vows or "contract," *see Order of St. Benedict*, 234 U.S. at 649, Father Hartke disposed of all personal property to the Dominican Order before his passing. *See id.* (upholding a similar agreement to "renounce[ ] 'all individual ownership of property, present or future, real or personal.'"). This is consistent with the inventory of the estate conducted in 1987, listing nothing of value in personal possessions or any tangible property of any sort, despite documented and public gifts to Father Hartke over the years, including the Dress. (*see* Affidavit of W.J. Shepherd,

**BATES 000020**

Exhibits C, D). Any claims against how the estate was inventoried or how personal property was excluded have long expired by the statute of limitations. *See* D.C. Code § 20–1303.

Even if Plaintiff is correct that McCambridge gifted Father Hartke the Dress in his *personal* capacity, Plaintiff assumes that Father Hartke accepted it and maintained it in his personal capacity. To the contrary, Father Hartke's personal belongings and effects were always owned by the Dominican Order.

Father Hartke never left the Order, and in a prior dispute over rights in his estate, the familial heirs did not object to the passing of Father Hartke's sole property right at the time, the right to publicity, to the College of the Immaculate Conception (Father Hartke's Dominican Order) in accordance with his vows.[14] The Dominican Order does not contest the University's ownership of the Dress. (*See* Affidavit of Father Latoile). Whether the Dress belongs to the estate or not, Plaintiff has no right to title, no stake in any controversy, and therefore, no standing.

### C.    Plaintiff Fails to Satisfy the Requirements for a Preliminary Injunction

#### 1.    Plaintiff is unlikely to succeed on the merits

Even if the Plaintiff establishes standing, Plaintiff's claim has no merit and is unlikely to succeed. The arguments and contemporaneous evidence, described in the prior sections, completely support the University's ownership of the Dress from 1973 and confirms Ms. McCambridge's specific intent to support the University's drama students with her donation. Father Hartke's vows, conduct, estate proceedings, and Ms. McCambridge's intent establish that the University clearly owns the Dress and always has since 1973.

In addition, to the surfeit of dispositive evidence, Plaintiff is unlikely to succeed on the merits for additional reasons. First, "[u]ndoubtedly,' noted the Supreme Court, "if a person be

---

[14]    The right to publicity was arguably not a "temporal good" covered by his vow, unlike the Dress at issue today. *See* Affidavit of W.J. Shepherd, Exhibit B.

BATES 000021

found in possession . . . it is prima facie evidence of his ownership." *Ricard v. Williams*, 20 U.S. (7 Wheat.) 59, 105 (1822); *see also Willcox v. Stroup*, 467 F.3d 409, 412 (4th Cir. 2006). "There is an old saying that 'Possession is nine-tenths of the law.' . . . The common law makes this old saying more than just a proverb – it is a rule of law that still holds sway." *Day v. Case Credit Corp.*, 2007 U.S. Dist. LEXIS 12465, *17, 2007 WL 604636 (E.D. Ark. February 22, 2007). "Under the common law, possession of personal property raises a rebuttable presumption of ownership." *Hall v. Schoenwetter*, 686 A.2d 980, 984 (Conn. 1996) (citing authorities). "The common law provides that possession of property constitutes prima facie evidence of ownership until a better title is proven." *Maine v. Adams*, 672 S.E.2d 862, 867 (Va. 2009).

The University retained possession over the Dress since the day Ms. McCambridge donated the Dress to the University on campus. Father Hartke received the Dress during school hours, on school property, and kept the Dress in his office, often showing the Dress to others. (*See* Affidavit of Bill Largess). Father Hartke did not lose or misplace the Dress.[15] Again, consistent with the other evidence and his vows as a Dominican Priest, Father Hartke *voluntarily* left the Dress with the University when he retired, not taking it home or transferring it to any relatives.[16] Father Hartke's treatment of the Dress during his lifetime, by leaving it in the University, is fully consistent with his vow to never take any tangible item to be his personal property. The Dress was then stored in the University continuously for the next several decades. As the complaint admits,

---

[15]   Affidavit of Professor Gail Beach (noting the University had full account of its location at least until 2006).

[16]   Even if Father Hartke owned the Dress personally at some point; he abandoned the Dress by leaving it to the University, consistent with his vows and his lifelong legacy to support the students as Ms. McCambridge intended.   "'[A] conversion claim cannot be grounded on abandoned property,' since the abandoning party can no longer assert a right to the property over which he or she intentionally relinquished control." *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1063 (D.C. 2014); *see also Block v. Fisher*, 103 A.2d 575, 576 (D.C. 1954) ("Abandonment of personal property is a complete defense to an action for conversion." (citation omitted)).

BATES 000022

the "relocation" occurred within the University, Compl. ¶ 9, and the University lost track internally of the Dress between 2006 and 2021, and when the Dress was found, it was in a box and bag within the University, and not with any other objects related to Father Hartke. (*See* Affidavit of Matthew Ripa). Based on this and other reasons, Plaintiff has no likelihood to succeed on the merits.

### 2. Plaintiff cannot demonstrate irreparable harm

In accordance with the governing D.C. law surrounding "Descent, Distribution, and Trust," even if the Dress is part of the estate of Father Hartke, Father Hartke died intestate, without direct descendants and no living parents at the time of probate. (*See* Affidavit of W. J. Shephard, Exhibit D).   Accordingly, under D.C. Code § 19–309, "the brother, sister, or child or descendant of a brother or sister is entitled to the whole." Further, where there are multiple brothers and sisters, under D.C. Code § 19–310, each brother or sister "is entitled to an equal share, and the children or descendants of a brother or sister of the intestate, stand in the place of their deceased parents respectively."  In accord with the Affidavit of Margo Carper, Father Hartke had six brothers and sisters, and five of those siblings have living descendants. (*See* Affidavit of Margo Carper, Exhibit A).  Two of those lines of the family (sister Inez Hartke and brother Joseph Ward Hartke) support a partition and auction in support of the students of Catholic University if the Dress had indeed been in Father Hartke's estate, which they deny. ((*See* Affidavit of Margo Carper; Affidavit of Thomas Kuiper; *see generally Carter v. Carter*, 516 A.2d 917, 920 (D.C. 1986) ("A cotenant's unilateral right of partition is an integral element of the form of property ownership inherited from English law known as the tenancy in common.")).[17]

"Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only

---

[17]   Plaintiff clearly did not seek the input of these family members in asserting the purported claims on behalf of Father Hartke's estate.

BATES 000023

be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375-76; *see also Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010). Here, Plaintiff has not demonstrated even the *possibility* of irreparable harm arising from the intended auction and sale of the Dress, let alone a clear showing. In fact, under any circumstance, given the interests and wishes of other heirs to the estate, the Dress would necessarily have to be sold. In other words, an auction does not cause the estate any irreparable injury.

The only possible injury to the Plaintiff would be purely economic in the form of Plaintiff's alleged one-fifth share of the proceeds after a partition (given Father Hartke's five siblings with living descendants). There are plenty of "remedies available at law, such as monetary damages" adequate "to compensate for that injury." In fact, *not proceeding* with the auction would harm the estate (and if she were to succeed, Plaintiff as well). The estate would need to invest the time and money on a subsequent auction when interest in the Dress may wane. Moreover, the estate's costs of litigation will further diminish the recovered value of the Dress.

On the other hand, the University that will be harmed should the auction not proceed, as discussed below.

### 3.    The balance of equities weighs in favor of the University

Similar to the analysis under irreparable injury, the balance of equities favors the University. The University spent over a year and significant resources to promote an auction in support of the drama students that Father Hartke and Mercedes McCambridge intended to support. At the eleventh hour, one heir with, at most, a one-fifth share of the estate, now requests that the auction not proceed. However, Plaintiff fails to submit any evidentiary support for any claim on the Dress or any right to keep the Dress as a whole for herself. Issuing an injunction would not only harm the value of the Dress by placing ownership under a cloud when no evidence for the estate's competing claims exist, it would render wasted all the time and energy invested by the

BATES 000024

University to maximize the value of the Dress.  Likewise, it will impose additional costs on the estate down the road.  Further litigation would only deplete any return from the Dress to serve Ms. McCambridge and Father Hartke's intent to support the University's drama students.  If Plaintiff is asking for her one-fifth share of the proceeds, Compl. ¶ 9, to which she is not entitled, the University agrees to put the money in escrow after the sale pending a final adjudication. Accordingly, Plaintiff suffers no hardship, but rather benefits from the University's efforts to maximize her alleged inheritance.

### 4.    The proposed injunction would disturb important public interests

Even in suits between private parties, the moving party must still demonstrate that a preliminary injunction would not harm the public interest.  *See SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest.");  *Tutor Time Learning Ctrs., LLC v. KOG Indus.*, 2012 U.S. Dist. LEXIS 162124, *20-21, 2012 WL 5497943 (E.D.N.Y. November 13, 2012).  Here, an injunction to stop a planned auction would only encourage plaintiffs with specious claims to file suit at the last minute before auctions to place a cloud on title, damage the rightful owners, and extract financial settlements by putting pressure on the parties planning the auction.

An injunction would also be inconsistent with the prior adjudication (more than 30 years ago) of the probate proceeding whereby the estate of Father Hartke was recognized to not have any personal possessions and was disposed of according to governing law.  Allowing a severely belated claim to the estate to serve as the basis for the extraordinary remedy of an injunction would not serve the public interest in the finality of legal proceedings.

An injunction would be further inconsistent with the wishes of Father Hartke, which are clear and not in dispute: that any gifts to him personally are null and void, and (even assuming he

**BATES 000025**

could accept the Dress personally), all of his personal possessions belong to the Dominican Order. Therefore, an injunction would not serve the public interest in following the clear, written wishes of deceased individuals.

Finally, an injunction would unduly implicate and undermine the religious vows taken by Father Hartke and other priests of the Dominican Order, disclaiming personal gifts and possessions. By permitting Plaintiff to enjoin the auction of the Dress, those vows would be upended – no less in favor of a claim that lacks merit. This would run contrary to the public interest in respecting and preserving the freedom of religion, as enshrined in the First Amendment.

Accordingly, an injunction would disturb and disrupt important public interests.

### D.    If Any Form of Relief is Granted, the Court Should Require a Bond in Accordance With Fed. R. Civ. P. 65(c).

The Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis supplied). The bond requirement incorporated into Fed. R. Civ. P. 65(c) "assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir.2011).

The Court "is vested with wide discretion" to determine the appropriate size of a bond posted under Fed. R. Civ. P. 65(c). *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961); *see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (noting that amount of bond rests in court's discretion); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (same).

**BATES 000026**

To that end, the language of Fed. R. Civ. P. 65(c) "mandates security for such damages as 'may' (not 'will') be suffered by a party subsequently found to have been wrongfully enjoined." *Interlink Int'l Fin. Servs. V. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001). Thus, a Fed. R. Civ. P. 65(c) bond "will usually be fixed in an amount that covers the 'potential' costs and losses the enjoined party will suffer as the result of being enjoined or restrained." *Id.* (internal citation omitted). "[I]n setting the amount of security for a preliminary injunction, the trial court should err on the high side," because "an error on the low side may produce irreparable injury" to the wrongfully enjoined party. Id. (internal citations and quotation marks omitted). Nevertheless, the Court "may dispense with the posting of security where there has been no proof of likelihood of harm to the party enjoined." *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974); *see also* 11A Wright-Miller-Kane, Federal Practice and Procedure (2d ed. 1994) at 293 ("[T]he court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant.").

Here, Plaintiff asks for a temporary restraining order and preliminary injunction wiping out nearly a year of marketing, publicizing, and organizing the sale of the Dress. (ECF No.7, p. 2.) Plaintiff asks that these restraints remain in place throughout the pendency of the action until the "claims in the Verified Complaint are adjudicated" which would further create uncertainty in the market and severely impacts Defendants' ability to market the Dress. Plaintiff's proposed preliminary injunction is also significant, disrupting a long-standing contractual arrangement between the Defendants and enormous efforts to put the Dress up for auction. These circumstances, and the obvious financial impact of having to cancel the scheduled auction of the Dress warrants a substantial security reflecting, at the very least, the aggregate amount expended to prepare for the scheduled sale and to proceed to sale at some later date. However, Defendants'

BATES 000027

costs in increasing awareness, creating publicity, and organizing the auction would have been wasted if the injunction was erroneously granted.  Consequently, in the event the Court grants any relief, a bond is necessary to account for that cost to Defendants.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion and order such further relief as the Court deems just, necessary, and proper.

May 18, 2022

/s/ Shawn A. Brenhouse
Shawn A. Brenhouse
Amin Al-Sarraf (*pro hac vice admission pending*)
LOCKE LORD LLP
*Attorneys for Defendant Catholic University of America*
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
shawn.brenhouse@lockelord.com
amin.alsarraf@lockelord.com

22

**BATES 000028**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BARBARA ANN HARTKE, an individual
on her own behalf and on behalf of the Estate
of decedent Gilbert V. Hartke

           Plaintiff,

   v.

BONHAM'S & BUTTERFIELD'S
AUCTIONEERS CORPORATION, A
DELAWARE CORPORATION; THE
CATHOLIC UNIVERSITY OF AMERICA,
A NON-PROFIT DISTRICT OF
COLUMBIA CORPORATION

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.: 22-cv-03571 (PGG)

**DECLARATION OF THOMAS TSO IN SUPPORT OF DEFENDANT CATHOLIC
UNIVERSITY OF AMERICA'S OPPOSITION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

**THOMAS TSO,** of full age, hereby declares:

1.     I am an attorney and Deputy General Counsel of Defendant Catholic University of America ("the University"). I make this declaration based upon personal knowledge, my review of documents publicly available.

2.     This declaration is submitted in support of the University's Opposition to Plaintiff Barbara Ann Hartke's application for a Temporary Restraining Order and Preliminary Injunction dated May 6, 2022.

1

**BATES 000029**

3.     The University respectfully requests the Court to take judicial notice of the documents listed below ("Exhibits").[1] The Exhibits are publicly available or referenced in Plaintiff's Complaint.

- Attached as **Exhibit "A"** is a true and correct copy of page B6 of the Washington Post newspaper, dated February 22, 1986.[2]

- Attached as **Exhibit "B"** is a true and correct copy of the Congressional Record from October 4, 1989, 135 Cong. Rec. 22458-459.[3]

- Attached as **Exhibit "C"** is a true and correct copy of pages A-1, C-1, C-5 of the Washington Star newspaper, dated May 7, 1979.

- Attached as **Exhibit "D"** is a true and correct copy of the docket entry for the probate proceedings for Father Gilbert V. Hartke in the Superior Court for the District of Columbia, 1986 ADM 001663.[4]

---

[1]    The Court can take judicial notice of the publicly available documents, including newspaper articles for noting its publication. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 4196 (S.D.N.Y. 2003) ("the Court may take judicial notice of the burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims.").

[2]    The online version is located here: https://www.washingtonpost.com/archive/local/1986/02/22/obituaries/25bb4b16-1758-45d9-b078-483228b460f1/.

[3]    The online version is here: https://www.govinfo.gov/content/pkg/GPO-CRECB-1989-pt16/pdf/GPO-CRECB-1989-pt16-2-3.pdf; *see generally Morning Star Packing Co. v. S.K. Foods, L.P.*, 2015 U.S. Dist. LEXIS 80034, *8, 2015-1 Trade Cas. (CCH) P79,206, 2015 WL 3797774 (E.D. Cal. June 18, 2015) (listing authority for taking judicial notice of Congressional Record).

[4]    The entry is also available here: https://eaccess.dccourts.gov/eaccess/search.page.3.2?x=Gxwjq2AFffcSuUsSLn3xr4HwRHWsNCU1XPQbYtuXNBkkYCgwsgiDvHcOKbWAKKsI9nBu3OuYiIMDf2bu4t7UNQ; *see generally Lefkowitz v. Bank of New York,* 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009) ("Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions.") (citations omitted).

**BATES 000030**

- Attached as **Exhibit "E"** is a true and correct copy of page H9 of the Washington Post newspaper, dated March 1, 1973.

- Attached as **Exhibit "F"** is a true and correct copy of page from the New York Post newspaper online, dated May 7, 2022.[5]

- Attached as **Exhibit "G"** is a true and correct copy of the University's press release, "Lost "Dorothy" Dress to be Auctioned for New Catholic University Film Program," dated April 19, 2022.[6]

- Attached as **Exhibit "H"** is a true and correct copy of Bonhams' advertisement referenced and incorporated into the Complaint ¶ 7.[7]

- Attached as **Exhibit "I"** is a true and correct copy of the Rule of Augustine, one of the church rules for the Dominican Order.[8]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 18, 2022

/s/ *Thomas Tso*
Thomas Tso

---

[5]     The online version is here: https://nypost.com/2022/05/07/battle-looms-over-1-5m-wizard-of-oz-dress-found-in-storage-closet/

[6]     The press release is available here: https://communications.catholic.edu/news/2022/04/lost-dorothy-dress-to-be-auctioned-for-new-catholic-university-film-program.html.

[7]     The website for the ad is: https://www.bonhams.com/auction/27564/lot/115/an-important-costume-worn-by-judy-garland-as-dorothy-in-the-wizard-of-oz/

[8]     The Rule of Augustine is available here: https://opeast.org/about/our-order/rule-st-augustine/.; *see generally Classis of Central California v. Miraloma Community Church*, 99 Cal. Rptr. 3d 449, 453 (Cal. App. 1st Dist. 2009) (taking judicial notice of church rules).

3

**BATES 000031**

# OBITUARIES

## Fr. Gilbert Hartke Dies; Built Catholic U. Theater

By Bart Barnes
Washington Post Staff Writer

The Rev. Gilbert V. Hartke, 79, a Dominican priest who founded the Department of Speech and Drama at Catholic University almost 50 years ago and built it into one of the foremost community and regional theater programs in the nation, died yesterday at Providence Hospital. He had suffered several heart attacks.

Father Hartke was a figure of legendary stature in the Washington theater community, but his influence and reputation extended far beyond this area.

More than anyone else, he was responsible for the building in 1970 of Catholic University's 590-seat Hartke Theatre in Northeast Washington. Such world-class theatrical figures as Helen Hayes, Cyril Ritchard and the Abbey Players have performed there over the years.

He created the National Players, a professional theatrical troupe of Catholic University drama graduates that since 1949 has played to audiences throughout the United States and in other countries ranging from China to Romania.

He was chairman of the Department of Speech and Drama from its founding in 1937 until he retired officially in 1974 to become professor emeritus of drama and special assistant to the president of the university. In fact, he remained the guiding force behind the university's drama program until he died.

His students over the years included Jerome Ragni, coauthor of the rock musical "Hair;" Mart Crowley, who wrote "The Boys in the Band;" John Pielmeier, author of "Agnes of God," and Jason Miller, who won a Pulitzer Prize for "That Championship Season." Drama critic Walter Kerr, television announcer Ed McMahon, directors Alan Schneider and Robert Moore, and actors Jon Voight, John McGiver and George Grizzard participated in Father Hartke's program as did Richard Bauer and Halo Wines of Washington's Arena Stage.

The Catholic drama department has produced more than 600 plays. The Olney Theatre in Montgomery County, an Actors Equity summer theater company organized in 1953 that has been designated as Maryland's State Summer Theatre, is an offshoot of Father Hartke's efforts in the speech and drama program at Catholic, as is the St. Michaels Playhouse in Vermont.

An imposing block of a man with a majestic head of white hair, Father Hartke was very much the man about town who seemed to turn up everywhere and know everyone, and his haunts ranged from the John F. Kennedy Center for the Performing Arts to Mel Krupin's restaurant on Connecticut Avenue, where his picture hangs on the wall with those of other celebrities who dine there regularly.

He was comfortable at the White House, where he was received and commended by presidents for more than three decades of his students' dramatic performances overseas on behalf of a variety of government programs and agencies. And he was comfortable among Washington Redskins football players, who once critiqued "Sis Boom Bah," a musical of which he was coauthor. When he developed a case of water on the knee—the "nun's disease," he called it, from years of kneeling in prayer—he was treated by Dr. Stan Lavine, longtime Redskins physician.

William H. Graham, who succeeded him as head of the drama department, said Father Hartke had "the wonderful combination of being very much a part of the world in which he lived and knowing how it operated, and a deep and abiding religious faith."

Not surprisingly, many of his program's graduates were unable to find careers in the highly competitive theater business. But Father Hartke always insisted that training in drama is a solid educational foundation for a variety of endeavors.

"What's more important is that they have great careers in life," he once said. He took particular delight in the fact that a few of his students each year would opt for a career in religious life. "In a sense, this program was his parish," said Graham.

In 1952 President Truman asked him to organize a delegation of actors to entertain soldiers in Korea, and in subsequent years he led Catholic University theatrical troupes to military installations in the Arctic, Japan, France and Germany and to Taiwan, the Sinai Peninsula, Italy, Holland and Belgium.

He sent a production to South America in 1958 under State Department auspices, and he took Eugene O'Neill's "Ah, Wilderness!" to Israel and six European countries in 1965 under a similar program. In May 1974 he directed a production of "Ah, Wilderness!" that played in Romania, and since 1969 teams of his drama students have taught and performed in Poland.

Helen Hayes, a native Washingtonian, was a friend of Father Hartke for 35 years since having sought solace in the Church after the death of her daughter from infantile paralysis at the age of 19. In several appearances as a guest actress in Catholic University productions, she stayed in the dormitories with the students, and she made the last stage appearance of her career at the Hartke Theatre in 1971 as the Irish, convent-bred Mary Tyrone in Eugene O'Neill's "Long Day's Journey Into Night."

As a young man in the Midwest, Father Hartke got to know Orson Welles when Welles was just beginning to produce theater in the suburbs of Chicago. In the fall of 1937 Welles spoke to the first class of drama students at Catholic University about the possibility of adapting Shakespeare to various forms of staging, and he subsequently became a major influence on the experimental productions that formed the basis of the Catholic University program.

Gilbert Vincent Hartke was born Jan. 16, 1907, one of five sons and four daughters, in a Chicago neighborhood where his father owned a drugstore near a pre-Hollywood film company. Before he was 7 years old he was acting in two-reel films, and he said several years later that he liked it so well "that by the time I was in the eighth grade I had decided on a career in show business."

But he was also drawn to the church. "From the time of my first communion I went to mass every day and often served as altar boy. It gave me a sense of completeness. It was so right for me." By the time he was 7, he recalled almost 70 years later, "I recognized that God wanted me to be a priest."

He played football in high school, attended Providence College, then joined the Order of Preachers, also known as the Dominicans, because that was where he thought his speaking and dramatic skills could best be used. During his first year of seminary training the Dominicans put him in charge of the production of six plays.

In 1936, the year he was ordained, he came to Catholic University to study for a master's degree in English. The following year, when the university decided it wanted a department of speech and drama, it asked the 30-year-old Father Hartke—who at the time was said to resemble Clark Gable—to organize it.

The intent was simply the improvement of common speech and the recognition of drama through the production of classical plays, and the development of playwrights. During the early years the quarters were makeshift and the productions predominantly one-act plays. By the summer of 1938 Father Hartke had persuaded Sara Allgood, the Abbey Theatre favorite who had just captivated New York in "Shadow and Substance," to come to Washington as his first guest actress.

Not until after World War II did the department get its own theater building and then only when Father Hartke located a condemned military theater at a naval base in Norfolk. He purchased it from the government for a dollar and arranged to have it hauled to Washington where it was reassembled and served as the university theater for 20 years. On Ash Wednesday in 1967 its roof caved in under a heavy snowfall, and the Speech and Drama Department moved once again to temporary quarters until the opening of the Hartke Theatre three years later.

Almost 2,500 students have gone through the program in speech and drama at Catholic University since 1937, and in that period Father Hartke has functioned as an administrator, director, actor, teacher, author and, more recently, unofficial patron saint.

"God's work includes striving for personal excellence," he said once. "The wonderful thing about the performing arts is that it is yourself against perfection. You have to be as perfect as you can, whether you act, write, produce, direct or design. You aren't in competition with another show or medium, you are in competition with yourself."

Father Hartke's survivors include one sister, Berenice E. Hartke of Chicago.

THE REV. GILBERT V. HARTKE

### Allen A. Crutchfield,

22, who was shot to death Feb. 11 outside his home in Chantilly, was the president of the A&C Plumbing Co., a subcontracting firm which he founded in 1984.

A spokesman for the Fairfax County police said no arrest has been made in the case.

Mr. Crutchfield was born in La Mesa, Calif. He grew up in Fairfax City and graduated from Fairfax High School. He had been a Boy Scout and active in the Fairfax County Police Soccer League.

He had worked in the building trades since high school and became a plumbing subcontractor when he formed A&C Plumbing.

Survivors include his wife, Cheryl, of Fairfax Station; a daughter, Rachel Ann McClure of Springfield; his parents, Nancy Van Brunt of Fairfax City and Paul Crutchfield of El Paso; and a brother, James Crutchfield of Fairfax City.

### Josephine Brooks Johnson,

88, a retired clerk supervisor with the records section of the Defense Department, died of pneumonia Feb. 16 at the Washington Hospital Center. She lived in Washington.

Mrs. Johnson was born in Aberdeen, Miss. She graduated from Rust College in Mississippi and taught music there before moving to the Washington area in 1921. She joined the old War Department in 1942. She transferred to the Defense Department when it was formed in 1947 and retired in 1964.

She was a member of the Women's Auxiliary of the National Association of Postal Employees and the Asbury United Methodist Church in Washington, where she was active in United Methodist Women.

Her husband, Robert Johnson, died in 1945. Survivors include two children, Bernice J. Tillett and Josephine Baker, both of Washington, and four grandchildren.

### Phyllis E. Dyar,

70, a retired laboratory technician at Alexandria Hospital, died of cancer Feb. 10 at her home in Seminole, Fla.

Mrs. Dyar was born in Johnstown, Pa. She moved to the Washington area during World War II. She worked for approximately 20 years at Alexandria Hospital before retiring as a laboratory technician about 1970.

A former resident of Alexandria, she had lived in Florida since 1979.

Her marriages to Charles Replogle and to Philip W. Chambers ended in divorce.

Survivors include her husband, Wallace J. Dyar, of Seminole; two daughters, Charla B. Replogle of Arlington and Joanne C. Confer of Midlothian, Va.; a stepson, F. Craig, of California; six grandchildren, and one great-grandchild.

### Abraham Goldberg,

89, a retired electrical engineer who worked in Washington for the Pullman Co. of Chicago, died of congestive heart failure Feb. 16 at the Carriage Hill Nursing Center in Silver Spring. He lived in Washington.

Mr. Goldberg was born in Washington. He graduated from McKinley Technical High School and Carnagie-Mellon University. He served in the Army during World War I, and then worked in Michigan and California before returning to this area in 1921. He went to work for the Pullman Co. during the 1920s and retired in 1963.

He was a Shriner and a member of the Elks. He also was a member of the American Society of Electrical Engineers and the Potomac River Squadron, of which he was a safety officer.

Survivors include his wife, Anna W., of Washington; two children, Morton, of Chevy Chase and Jean Flaharty of Bethesda; three grandchildren, and four great-grandchildren.

OBITUARY ON PAGE B4

## DEATHS ELSEWHERE

**Brig. Gen. Gideon Mahanaimi,** 58, a top antiterrorism adviser to Israeli Prime Minister Shimon Peres, died Feb. 18 at his home in a Tel Aviv suburb after a heart attack.

Prime Minister Menachem Begin appointed him deputy adviser on terrorism in 1982, and Gen. Mahanaimi continued in his post under prime ministers Yitzhak Shamir and Peres.

**Paul Stewart,** 77, the veteran actor who made his film debut in Orson Welles' "Citizen Kane" and who also worked in stage, radio and television, died of a heart ailment Feb. 17 at a hospital in Los Angeles.

A New York City native, Mr. Stewart appeared in more than 50 films, and played in or directed 5,000 radio and television shows. His movie credits include "Mr. Lucky" (1943), "Twelve O'Clock High" (1950), and "The Greatest Story Ever Told" (1965). His last stage performance was as Doc opposite Henry Fonda in a revival of "Mr. Roberts."

**Pierre Schlumberger,** 71, a former chief executive of the world's largest oil field services company, died Feb. 18 in Paris. The cause of death was not reported.

He was a son of Marcel Schlumberger, a mechanical engineer who founded Schlumberger Ltd. in Paris in the 1920s. Pierre Schlumberger worked for the company for 25 years and was president and chief executive when he retired in 1965. He was a founder of the Museum of Modern Art in Houston.

**Dr. Francis McLaughlin,** 71, a Baltimore psychoanalyst and a former president of both the Maryland Psychiatric Society and the American Psychoanalytic Association, died of a heart ailment Feb. 17 at the Greater Baltimore Medical Center.

## IN MEMORIAM

**HART, MARY B.**
(February 22, 1979)
**HART, EARL F.**
(July 25, 1975)
In loving memory of my dear grandparents
Peaceful be thy rest, dear Ma and Gramps
It is sweet to breathe thy name.
As in life I love you dearly,
So in death I do the same.
Your Granddaughter, LINDA A. SMALLWOOD

**HAYNESWORTH, KENNETH LEE**
In loving memory of my uncle, KENNETH LEE HAYNESWORTH, who departed this life one year ago today.
I loved you yesterday, I love you today,
I'll love you even more tomorrow.
May you rest in peace.
Your Loving Niece, Dawn

**HENRY, NAOMI DREW**
The miles that stretch between us
Just seem longer every day
May you find a joy in knowing
That you're just a thought away.
Many miles may separate us
And the clouds between be grey,
But you're cherished in my heart, Dear,
And you're just a thought away.

**JOHNSON, DEACON JAMES**
In loving memory of my husband Deacon JAMES JOHNSON who departed this life 12 years ago today, February 22
12 years ago, you left us
To join the Heavenly shores
Some day I'm coming to meet you
And parting will be no more
Loving wife, ERNESTINE JOHNSON

**KUYKENDALL, CLARANCE L.**
In loving memory of my husband and our father, who departed this life one year ago today.
STELLA KUYKENDALL and FAMILY

**MANNING, ROSALIE J. (ROSE)**
In loving memory of our dear wife and mother who departed this life February 22, 1985.
When Peace like a River attendeth my way
When sorrows like sea billows roll,
whatever my lot, thou has taught me to say,
It is well, it is well with my soul.
Your Devoted Husband, Lewis B. Manning, Sr.
Children, Frances, Lewis B., Jr., Sandra M. and Beverly M. Burch

**MILLER, HELEN E.**
Remembering HELEN E. MILLER
You are a thousand winds that blow,
You are the diamond's glint on snow
You are the sunlight on ripened grain,
You are the gentle autumn's rain.
When I awaken in the morning's hush
You are the swift uplifting rush
Of quiet birds in circled flight,
You are the soft star that shines at night
So, I do not stand at your grave and weep,
For you are not there, you do not sleep.
Husband, JOE

**MORELAND, ALBERT J.**
In loving memory of ALBERT J. MORELAND, who passed away one year ago today, February 22, 1985.
Surrounded by children, I am lonesome.
In the midst of my joys, I am blue.
With a smile on my face, I've a heartache,
Longing dear Husband for you.
I think of you today with love
as I have often done.
I feel again the bitter blow,
that should have never come
Sometimes I think I'm dreaming,
for I can't believe it's true,
That I should go on living
when I no longer have you.
Forever in my thoughts,
Your Wife, ANITA

**SCHUTZ, MARTHA V.**
In loving memory of my wife, our mother and grandmother, MARTHA V. SCHUTZ, who passed away nine years ago, February 22, 1977.
Deep in our hearts your memories are kept
We loved you much too much to ever forget.
Your Husband, Children and Grandchildren

**SHORTER, JESSIE ADDISON**
In memory of our mother on her birthday, February 22.
You are a precious memory.
Daughters, EVELYN, JESSIE and GENEVA

**STROMAN, JOHN**
In loving memory of our husband, father and grandfather, who departed this life one year ago today, February 22, 1985.
In tears, we saw you sinking,
And watched you fade away.
Our hearts were almost broken
We wanted you to stay.
But when we saw you sleeping,
So peacefully and free from pain,
How could we wish you back with us,
To suffer than again.
So the broken hearts you left behind,
That loved you so sincere,
Never did, and never will forget you, Papa Dear.
THE FAMILY

**ZELASKA, WALTER**
Who passed away so suddenly, one year ago today, February 22, 1985.
So many heartaches, and many a tear
At the end of this long, lonely year,
But my heart and love went with you
The day God eased your pain,
So rest in peace, my darling
And some day we will be together again
All My Love
DOROTHY

## DEATH NOTICES

**BARNES, CATHERINE McR.**
On February 20, 1986 CATHERINE McR. BARNES, of Fairhaven, Sykesville, MD; beloved wife of Robert L. and devoted mother of Catherine L. D. Brown, Richard J. H. and Andrew McR. Barnes; and loving sister of Alice B. McReynolds and George McReynolds. Memorial services from Fairhaven Chapel, 7200 Third ave., Sykesville, MD on Tuesday at 11:30 am.

**BEGNOCHE, YVONNE H.**
On Thursday, February 20, 1986, YVONNE H. BEGNOCHE of Falls Church, Va.; Beloved wife of Antoine E. Begnoche; mother of Jeanne Elliott and Dianne, Cecile B. Kelly and Amelie B. Daley. She also is survived by 11 grandchildren and six great-grandchildren. Friends may call at THE MURPHY'S FALLS CHURCH FUNERAL HOME, 1102 W. Broad st., Falls Church, Va., 2 to 4 and 7 to 9 p.m. Sunday, where prayers will be recited at 8 p.m. Funeral Mass from St. Anthony's Catholic Church on Monday, February 24 at 10 a.m. Interment Fairfax Memorial Park.

**BIERBOWER, DR. GEORGE W.**
On February 19, 1986 at Fairfax Hospital. Survived by his wife, Helen L. Bierbower; four children, George R. Bierbower, Janet L. Weaver and husband Mark F., Sharon L. Bierbower and Sheryl A. Elsasser and husband Ken. Also survived by three sisters, Ruth Powell, Dorothy Jesse and Thelma Fields; two grandchildren, Victoria Lynn Weaver and Mark Daniel Weaver. Friends may call from 2 to 4 and 7 to 9 p.m. Saturday and Sunday at the DEMAINE SPRINGFIELD ANNANDALE CHAPEL, Backlick and Edsall rds., Springfield, where services will be held on Monday at 12 Noon with interment at Quantico National Cemetery.

**BROWN, MARY T.**
On Wednesday, February 19, 1986 at Georgetown Univ. Hospital, MARY T. BROWN of 1637 W. Va. ave., ne. She is survived by three nieces, Alice C. Matthews, Willie Mae Whitmeyer and Sarah R. Brown; one step-son; two sisters-in-law; cousins and a host of friends. The late Mrs. Brown may be viewed at the STEWART FUNERAL HOME, 4001 Benning rd., ne., from 6 to 9 p.m. on Sunday, where services will be held Monday, February 24, at 11 a.m. Interment Harmony Memorial Park.

**BURNS, BRIDGETTA D.**
On Thursday, February 20, 1986 of Alexandria, Va.; mother of Barbara Burns of Alexandria, Va.; sister of Kathleen Cohalt of Woodbridge, Va. Friends may call at the MURPHY FUNERAL HOME OF ARLINGTON, 4510 Wilson Blvd., where the family will be present 2 to 4 and 7 to 9 p.m. Sunday, and where prayers will be recited at 3:30 p.m. Funeral Mass will be offered at 10 a.m. Monday, February 24, at the Cathedral of St. Thomas More. Interment Arlington National Cemetery.

**BUSH, MARY ETTA**
On Thursday, February 20, 1986, MARY ETTA BUSH; beloved mother of Jean Middleton, Mary Burley, Herman, Raymond and George Bush; she also is survived by four sisters, one brother, many nieces, nephews, other relatives and friends. The late Mrs. Bush may be viewed at the STEWART FUNERAL HOME, 4001 Benning rd., ne., from 6 to 9 pm Sunday with Rosary Vigil at 7:30 pm. Services will be at the Holy Comforter Church, 1357 East Capitol st., se., Monday, February 24 at 10 am. Interment Harmony Memorial Park.

**CHESIVOIR, NORMA**
On Thursday, February 20, 1986, NORMA CHESIVOIR of Silver Spring, Md., dear daughter of Rose Chesivoir and the late Ben Chesivoir; loving niece of Ida Mendelson, Belle Solesel and the late Martha Wohl. Services at the DANZANSKY-GOLDBERG MEMORIAL CHAPELS, 1170 Rockville Pike, Rockville, Md. on Sunday, February 23, at 11:30 a.m. Interment Cemetery of the Adas Israel Congregation. The family will be in mourning through Tuesday evening at her late residence. Expressions of sympathy in her memory may be made to the American Cancer Society or the Women's Progress Club of Silver Spring, Md.

**CORNWELL, DOUGLAS**
The officers and Comrades of John M. Carter VFW Post No. 9867 are hereby notified of the death of Past Post Commander DOUGLAS CORNWELL. VFW services will be held Sunday evening, 8 pm at the Pumphrey Funeral Home, West Montgomery ave., Rockville, Md. Services will be held at 11 am at the funeral home. Interment Parklawn Cemetery.
Kenneth L. Britler, Commander
Buck Anderson, Chaplain

**CORNWELL, DOUGLAS L.**
On Thursday, February 20, 1986 of Rockville, Md; beloved husband of Charlotte E. Cornwell; father of Diane King and Christine Mathers; son of Massie Cornwell; brother of George and Norman Cornwell, Frances Denals, Mildred Magruder, Betty Bradshaw, Ruth Mosley, Helen Burns and Sue Puttlarcken; grandfather of William McHugh, Jason, Samuel and Daniel King. Also one great-grandson. Friends will be received at PUMPHREY'S COLONIAL FUNERAL HOME, 300 W. Montgomery ave. (Rte 28, just off I-270), Rockville, Md. on Sunday from 3 to 5 and 7 to 9 p.m., where services will be held on Monday at 11 a.m. Interment Parklawn Memorial Park.

**CROSSLEY, CLARENCE WILLIAM**
Age 84 of Upper Marlboro, MD on Thursday, February 20, 1986 in a Calvert County Hospital. He is survived by his wife, Emma Bradshaw Crossley; eight children, 22 grandchildren, 25 great-grandchildren. Funeral services Sunday 2pm at Jones-Ash Funeral Home, Rainswood. Interment Gideon Baptist Church Cemetery, Village, VA.

**DEKEYSER, DR. HENRY L.**
Age 72, of 1602 Old Carlisle rd., Aspers, Pa., formerly of Washington, D.C. on Thursday, February 20, 1986, at his home. He is survived by his mother Leona Gardner DeKeyser; husband of Miriam Group DeKeyser. He was a member of Gettysburg Presbyterian Church; retired Principal of Capitol Page School, Washington, D.C., received his doctorate from George Washington University. Funeral Services, Sunday, February 23rd, at 2 p.m., at THE MONAHAN FUNERAL HOME, Gettysburg, Pa. Interment Clines Cemetery. Memorials may be made to The American Heart Association.

**ETHEL, WILLIS G.**
This is to notify Arlington Host Lion Club Members of the death of Past President WILLIS G. ETHEL. Visitation Sunday, 2 to 4 pm, Arlington Funeral Home. Funeral service Monday, Jons Ft. Myer Chapel.
Bill Corley, Secretary

**ETHEL, WILLIS G.**
Colonel, U.S. Army (Ret.)
On Friday, February 21, 1986 at Arlington Hospital, Col. WILLIS G. ETHEL, USA (ret.) of Arlington, VA, husband of the late Florence M. Ethel; father of Robert P. Ethel, Vienna, VA; Bonnie G. Stockdale, Big Sandy, TN and Willis G. Ethel, Jr., Sacramento, CA; he is also survived by three grandchildren, two great-grandchildren and a devoted friend, Muriel E. Heitzey. Friends may call at the ARLINGTON FUNERAL HOME, 3901 N. Fairfax dr., Arlington, VA from 2 to 4 pm Sunday. Services Monday 3 pm at Ft. Myer Chapel. Interment Arlington National Cemetery with full military honors. If desired, contributions may be made to Old Dominion Eye Bank, 5855 Bremo rd., Suite 203, Richmond, VA 23226 or the Arlington Hospital Foundation.

**EVANS, CARLETON K. JR.**
On Thursday, February 20, 1986 at his residence CARLETON K. EVANS JR.; husband of Nancy G. Evans; father of Dorian Kesloich, Mark C., Brian S., Laura L. and Alan J. Evans. A memorial service will be held on Monday, February 24, 1986 at Good Shepherd Episcopal Church, 818 University blvd. w., Silver Spring, Md. at 8 p.m. In lieu of flowers, family suggests contributions to the American Heart Fund.

**FOLEY, MARGARET F.**
of Silver Spring, Md. on Thursday, February 20, 1986; beloved sister of Grace F. Speake; sister-in-law of Edwin R. Speake, Jr.; beloved aunt of Margaret J. Haering, Edwin R. Speake III and William Timothy Speake. A memorial service will be held at the Episcopal Church of Our Saviour, 1700 Powder Mill rd., Silver Spring, Md. on Sunday, February 23 at 2 p.m. Interment private. Family requests in lieu of flowers, contributions be made to the Church of Our Saviour. Arrangements by HINES/RINALDI.

**FRANCIS, AGNES**
On Monday, February 17, 1986, AGNES G. FRANCIS; beloved grandmother of Martina H. Richardson and Cassandra R. Avans; great-grandmother of Marguerite and Jesse Avans, Jr. and Larry Jerome Richardson II. She also is survived by one sister, Viola Bradford; one brother, John G. Francis; many nieces, nephews, her stepmother, Arminta Francis; other relatives and friends. The late Mrs. Francis may be viewed at the STEWART FUNERAL HOME, 4001 Benning rd. ne. from 6 to 9 p.m. Sunday. Funeral Monday, February 24 at the Greater Mount Zion Baptist Church, 6th & Maryland ave. ne. at 11 a.m. Interment Harmony Memorial Park.

**FRANKLIN, HERBERT R.**
On February 21, 1986, of Hyattsville, Md. Husband of Marjory L. Franklin; father of Susanne M. Franklin, John K. and Thomas M. Franklin; five grandchildren, four sisters and two brothers also survive. Friends may call at Gasch's Funeral Home, 4739 Baltimore ave., Hyattsville, Md., Sunday, 12 Noon to 4 and 7 to 9 p.m., where services will be held at 2 p.m. Interment services will be held at Fort Hill Cemetery, Lynchburg, Va. on Monday, February 24, at 1 p.m. Those desiring may make contributions to the charity of their choice.

**GAVER, VIRGINIA K.**
On February 21, 1986, at Sleepy Hollow Nursing Home. Wife of the late Max L. Gaver; sister of Rebecca M. Dyer, Ollie K. Kibler, M. Louise Gaver and Virgie L. Kiblinger. Friends may call at THE COLONIAL FUNERAL HOME, 6161 Leesburg pk., Falls Church, Va. on Sunday, February 23, 1986 from 7 to 9 p.m., where services will be held Monday, at 11 a.m. Interment National Memorial Park.

**GOLDTHORPE, J. HAROLD**
On February 19, 1986. A memorial service for Dr. J. HAROLD GOLDTHORPE, will be held at 4 p.m., Sunday, February 23, at the Metropolitan Memorial United Methodist Church. Expressions of sympathy may be sent to the scholarship fund of Wesley Theological Seminary, 4400 Massachusetts ave. nw., Washington, D.C. 20016.

**GRAY, JAMES E.**
A special communication of Victory Lodge No. 23, F. & A.M., (PHA) is called for Monday, February 24, 1986 at 10:30 a.m. at Jarvis Funeral Home., 1432 You st. nw. for the purpose of performing the last rites for our departed Brother. Wake Sunday, February 23, from 5 to 8 p.m. at the funeral home.
Forman Bostick, W.M.
Fred L. Jones Sr., P.M./Secy.

**GREISCH, ANNA**
On Thursday, February 20, 1986, at Potomac Hospital, ANNA GREISCH of Woodbridge, VA; aunt of George G. Miller. Friends may call at the EVERLY FUNERAL HOME, 10565 Main st., Fairfax, VA, on Saturday and Sunday from 7 to 9 p.m. Graveside services will be held on Monday, February 24 at 1:30 pm at Fairfax Memorial Park

**GROVERMAN, ARTHUR BLAKE**
On Thursday, February 20, 1986 at his residence, ARTHUR BLAKE GROVERMAN, Beloved husband of Mildred F. Groverman; brother of Alice Ainslie. He also is survived by a niece Alice Anna Freund, two nephews Lee Sandford Ainslie, Jr. and Craig Smith and five great-nieces and nephews. Services will be private.

**HARTKE, REV. GILBERT V., O.P.**
On Friday February 21, 1986, the beloved brother of Bernice Hartke. He is also survived by numerous nieces and nephews. Father Hartke will lie in state from 2 to 9 p.m. on Monday, February 24, in the Crypt Church of the National Shrine of the Immaculate Conception, 4th and Michigan ave., ne. Mass of Christian Burial will be offered on Tuesday, February 25, at 11 a.m. from the Upper Church of the National Shrine of the Immaculate Conception. Interment Mt. Olivet Cemetery. In lieu of flowers, donations in memory of Father Hartke should be made to the Dominican House of Studies Scholarship Fund for Young Men Studying for the Priesthood, 487 Michigan ave., ne., D.C. 20017.

**HERMAN, MARY ANN**
On Wednesday, February 19, 1986, of Rockville, Md. Beloved wife of John D. Herman, M.D.; mother of John D. Herman III of San Jose, Ca., Robert S. and Betsy Ann Herman; niece of Marion Walrath of Tribes Hill, N.Y. Memorial services will be held at Faith United Methodist Church, 6810 Montrose rd., Rockville, Md. Saturday, February 22nd, at 1:30 p.m. Interment private. In lieu of flowers contributions may be made to The American Cancer Society, 11323 Amherst ave., Silver Spring, Md. 20902. Arrangements by PUMPHREY'S BETHESDA-CHEVY CHASE FUNERAL HOME.

**JEFFERSON, FLETCHER**
On Monday, February 17, 1986, FLETCHER JEFFERSON. Surviving are six sisters, two brothers, nieces, nephews, other relatives and friends. From 6 to 9 p.m., Sunday, February 23, friends are invited to call at THE JARVIS CHAPEL, 1432 You st. nw., where services will be held on Monday, February 24 at 12 noon. Interment Lincoln Memorial Cemetery.

**JOHNSON, BARBARA GREENOUGH**
On Thursday, February 20, 1986 at Sibley Memorial Hospital BARBARA GREENOUGH JOHNSON of Washington, D.C.; beloved wife of Reginald T. Johnson; mother of Corinna Prentiss Shillingford. Also survived by two sisters and two grandchildren. Memorial service will be held at Christ Episcopal Church, 31st and O sts., n.w. on Monday, February 24 at 2 p.m. Interment private. In lieu of flowers, contributions may be made to The Winsor School, Pilgrim rd., Brookline, Mass. 02146. Arrangements by GAWLERS.

**JOHNSON, EMMA J. (REV. SISTER)**
On Tuesday, February 18, 1986 at the Greater Southeast Community Hospital, beloved wife of the late Rev. Cellier D. Johnson; mother of Warren Newton and the late Florence Chappell; sister of Simon and George Stewart, Mary Ball and Rev. Sister Minnie Robinson; also survived by nine grandchildren, eight great-grandchildren, three great-great grandchildren; one daughter-in-law and a host of other relatives and friends. The late Mrs. Johnson will lie in state at Mt. Pleasant Baptist Church, 210 Rhode Island ave., nw., on Sunday, February 23 from 6 to 9 pm where funeral services will be held on Monday, February 24 at 11 am. Rev. Cindy Yancey, Pastor. Interment Lincoln Memorial Cemetery. Family requests all flowers to be delivered to the above named church on Sunday. Services by LATNEYS FUNERAL HOME.

**JONES, LUCILLE A.**
On Thursday, February 20, 1986 at Fairfax Hospital, LUCILLE A. JONES of Falls Church, Va; wife of the late Thomas R. Jones, Sr.; mother of Rev. Neal Jones (pastor of Columbia Baptist Church), Janice Engels, Marilyn McMillan and Thomas R. Jones, Jr. Also survived by 12 grandchildren and three great-grandchildren. A memorial celebration will be held on Saturday, February 22 at 11 a.m. at Columbia Baptist Church, 103 W. Columbia st., Falls Church, Va. Arrangements by PEARSON FUNERAL HOME, Falls Church.

**KIRKPATRICK, RENA D.**
Age 78. Formerly of Arlington, Va.; loving wife of Lester (Kirk) Kirkpatrick; on February 19, 1986 in Richmond, Va. She also is survived by a daughter and son-in-law, Dolly and Jack Carroll of Richmond, Va., a son and daughter-in-law, Dr. Barry and Marilyn Kirkpatrick of Midlothian, Va.; grandmother of John, Stephanie and Mary Katherine Carroll and Sarah and Matthew Todd Kirkpatrick; sister of Amelia Vassilion, Inez Lander, Frank and Ilale Andriello, all of Syracuse, N.Y. Funeral services from the MURPHY FALLS CHURCH FUNERAL HOME, 1102 West Broad st., Falls Church, Va. on Saturday, February 22nd, at 12 Noon. Interment National Memorial Park. Visitation one hour prior to funeral service. The family requests that donations be made to The Good Samaritan Fund, St. Mary's Hospital, 5801 Bremo rd., Richmond, Va. 23226.

**KOURY, MARY K.**
On Friday, February 21, 1986, MARY K. KOURY, of Falls Church, Va. Beloved mother of Dr. John A. Koury; mother-in-law of Cessette C. Koury; grandmother of Raymond Koury and Alida K. Sullivan. Funeral Mass from St. George's Antioch Orthodox Church, 16th and Webster sts. nw., Washington, D.C. on Saturday, February 22, at 10 a.m. Interment National Memorial Park. Arrangements by THE MURPHY'S FALLS CHURCH FUNERAL HOME.

**LA FRANCE, GERMAINE**
On Friday, February 21, 1986 of Silver Spring, Md.; beloved wife of Louis Philippe La France; mother of John and Roger La France and Jeannine Kenworthy; sister of Berthe Morissette. Also survived by 10 grandchildren and three great-grandchildren. Friends may call at HINES/RINALDI FUNERAL HOME, 11800 New Hampshire ave., Silver Spring, Md., Sunday 2 to 4 and 7 to 9 p.m. Mass of Christian Burial at St. Michael's The Arch Angel Catholic Church, 824 Pershing dr., Silver Spring, Md. on Monday, February 24 at 10 a.m. Interment Gate of Heaven Cemetery. The family suggests that contributions be made to Montgomery County Cancer Society or Holy Cross Hospice.

**LEE, AUBREY J.**
On Friday, February 21, 1986, at Fairfax Nursing Center; beloved husband of Margaret M. Lee; father of Spencer Lee and Catherine Hutchinson; he is also survived by nine grandchildren and eight great-grandchildren. Friends may call at the MONEY AND KING VIENNA FUNERAL HOME, 171 W. Maple ave., Vienna, Va., from 2 to 4 and 7 to 9 pm Sunday, February 23, where services will be held Monday, February 24 at 11am. Interment National Memorial Park.

**LUTZ, EARL EUGENE**
On Friday, February 21, 1986 at Washington Adventist Hospital; beloved husband of Ruby Mae Lutz; father of Ralph E. and Earl H. Lutz and Marilyn L. Wood. Also survived by 11 grandchildren and 10 great-grandchildren. Memorial services will be held at HINES/RINALDI FUNERAL HOME, 11800 New Hampshire ave., Silver Spring, Md. on Monday, February 24 at 2:30 p.m. Interment private.

**McQUEEN, IRENE L. (age 99)**
On Thursday, February 20, 1986 at the Southern Maryland Hospital; loving and devoted mother of Robert, Walter and Adelaide James, Natalie Strong, Janice Foster, Bertha L. Jones and Mabel Calvin. She also is survived by 49 grandchildren, a host of great and great-great grandchildren, nieces, nephews, cousins, other relatives, devoted in-laws and friends. The late Mrs. McQueen will lie in state from 6 to 9 p.m. Sunday, February 23 at the Metropolitan Wesley A.M.E. Church, North Capitol and R sts., n.w., where funeral services will be held at 11 a.m. Monday, Rev. John D. McArthur, officiating. Interment Harmony Memorial Park. Arrangements by POPE FUNERAL HOME.

**MESHAW, JOHN W.**
On Tuesday, February 18, 1986. Husband of the late Mildred V. Meshaw; father of loving and faithful daughter Mary Thurston and Clara M. Pander of St. Petersburg, Fla., two nieces Idamaye and Elizabeth Beardley, one nephew Wilbur L. Micheaux. Also surviving are one grand-daughter and one great-grand-daughter, other relatives and friends. The family will receive friends at the JOHN T. RHINES CO. FUNERAL HOME, 3015 12th st., ne, from 5 to 7 p.m., Sunday, February 23rd, and where Funeral Service will be held Monday, February 24th, at 11 a.m. Interment Lincoln Memorial Cemetery.

**MINAN, MARGARET L.**
On Friday, February 21, 1986, MARGARET L. MINAN, of Springfield, Va. Beloved wife of Lester F. Minan; brother of Susan P., Patrick F., Deborah A., Peter P., Dennis J. Minan and Nancy A. Frever. Also survived by four grandchildren, two sisters and a brother. Friends may call at THE MURPHY'S FALLS CHURCH FUNERAL HOME, 1102 W. Broad st., Falls Church, Va. where the family will be present from 2 to 4 and 7 to 9 p.m., Sunday and where prayer service will be held at 7:30 p.m. Funeral Mass will be offered at 10 a.m., Monday, February 24, at St. James Catholic Church. Interment National Memorial Park.

**MOORE, ROBERT M. JR.**
On Friday, February 21, 1986, ROBERT M. MOORE, JR.; the beloved husband of Catherine E. Moore; father of Sharon Hayman. He also is survived by three grandchildren and two great-grandchildren. Friends may call at the GEORGE P. KALAS FUNERAL HOME, 6160 Oxon Hill rd., Oxon Hill, Md. on Saturday and Sunday from 2 to 4 and 7 to 9 p.m., where services will be held on Monday, February 24 at 12 noon. Interment Maryland Veterans Cemetery, Cheltenham, Md.

**MOYER, LOUIS ARTHUR**
Age 65. On Thursday, February 20, 1986, of Edinburg, VA; long time resident of Cheverly and Mt. Rainier; formerly Engine Manager, Andrews Air Force Base; husband of Jeannette B. Moyer; father of Louis A. Moyer Jr., Linda Moyer Anderson and Nancy M. Saylor; five grandchildren, six sisters and two brothers. Viewing Saturday, February 22, 1986 at Bradley Funeral Home, Luray, VA. where funeral services will be held Sunday, February 23, 1986 at 2 pm. Interment Beahm's Chapel Cemetery, Luray, VA.

**MROCZKA, PAULINE J.**
On Friday, February 21, 1986, PAULINE J. MROCZKA of Silver Spring, Md., beloved wife of Michael J. Mroczka; mother of Mitch P., Jacqueline L. and Sandra Jo Mroczka. Memorial service will be held at COLLINS FUNERAL HOME, 500 Univ. blvd. w., Silver Spring, Md., on Sunday, February 23, at 2 p.m. Interment private. Sympathy may be expressed in the form of memorials to the American Lung Assn.

**MUZIKO, GEORGE M.**
The officers and members of Plumbers Local Union No. 5 are hereby notified of the death of Brother GEORGE M. MUZIKO.
Brother Muziko passed away on February 19, 1986 in Charlottesville, Va. where a private memorial service will be held.
Robert S. Parker, Business Manager

**OFFUTT, THOMAS JEROME**
On Thursday, February 20, 1986, THOMAS J. OFFUTT of Arlington, VA; husband of Evelyn S. Offutt; father of Anne Calla Urquhart, Chantal Paradiso, Mary, Anthony J. and Thomas J. Jr. Offutt; brother of William E. Offutt, Jr., and Ann Hamilton; also survived by 14 grandchildren and two great-grandchildren. Friends may call at the MURPHY FUNERAL HOME OF ARLINGTON, 4510 Wilson blvd., where the family will be present from 2 to 6 pm Sunday and where prayer services will be held at 6 pm. Funeral Mass to be offered at 10:30 am Monday, February 24 at St. Agnes Catholic Church. Interment Columbia Gardens Cemetery. Expressions of sympathy may be made to the Arlington Hospital Foundation, Arlington, Va.

**PERRY, AVERI (Baby)**
On Tuesday, February 18, 1986 at the Prince Georges General Hospital; beloved daughter of Lloyd and Terri Perry; also surviving are other relatives and friends. Funeral and viewing Saturday, February 22 at 10 am at LATNEYS FUNERAL HOME, 3831 Georgia ave., nw. Interment Fort Lincoln Cemetery.

**ZEHMER, ELSIE**
On Wednesday, February 19, 1986 at Washington House, Alexandria, Va; she is survived by two sisters, Mrs. Mildred Crowder, Richmond, Va. and Mrs. Maude Z. Smith, Fairfax, Va. Graveside services will be held February 22 at 1 p.m. at Asbury Methodist Cemetery, McKenney, Va.

## CEMETERY LOTS

FT. LINCOLN—2 crypts w/bronze memorial outside of Garden of the Apostles, in front of Thaddeus. 946-4367.

KING DAVID—Nat'l Memorial Park: 4 lots; 4 lots; 2 lots. Sold in sets. $800/each place. 649-4348

**NATIONAL MEMORIAL PARK**
Falls Church, Va.
All artificial decorations will be removed from National Memorial Park on March 1, 1986

PARKLAWN—2 lots & 2 crypts, $2500, 891-4058/nights 588-4609.

PARKLAWN CEMETERY—Two burial lots. Call 899-4004.

PARKLAWN—Garden of Meditation. Interment for 4. Valued at $3,110. Sale $2400. 301-761-0122

**NOTICE:**
**PARKLAWN CEMETERY will remove and discard all winter wreaths, potted plants, artificial flowers beginning March 7, 1986.**

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*September 28, 1989*　　　　EXTENSIONS OF REMARKS　　　　**22459**

Voight, and playwright John Pielmeier are among those in the film recalling Father Hartke's humor, kindness, and wisdom.

Father Hartke's traditions of hard work and religious and esthetic values helped shape the lives of several thousand students of diverse races, colors, and creeds and those students share their talents with others around the world.

Each year since President Harry S. Truman asked Father Hartke to put together a troupe of young actors and actresses to entertain American military forces abroad, CUA students have brightened the winter holidays of U.S. armed services stationed overseas by performing in musical revues on U.S. military basis in Europe and other far-flung locations.

Every summer, CUA drama majors teach English, drama and American popular culture to university students in Poznan, Poland.

Father Hartke founded the National Players in 1949. The Nation's oldest continuous repertory touring company, the Players enters its 41st year of bringing Shakespeare and other dramatists to audiences throughout the country. In addition, the drama department, which Father Hartke established, operates community outreach programs and offers special performances for high school and other groups.

Mr. Speaker, I congratulate the Catholic University's Hartke Theatre on its 20th anniversary. The theater is a fitting tribute to Father Hartke's service as priest and teacher.

---

## BEST WISHES TO THE REPUBLIC OF CHINA ON TAIWAN

### HON. CHARLES ROSE
OF NORTH CAROLINA

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 28, 1989*

Mr. ROSE. Mr. Speaker, I am most honored to convey my best wishes to my friends in the Republic of China on Taiwan as they celebrate their 78th National Day on Tuesday, October 10, 1989.

The whole world has watched Taiwan's development from a poor island country into a major economic power today—all within a short period of 40 years. Today Taiwan is our fifth largest trading partner, enjoying $75 billion in foreign reserve and a per capita GNP of more than $6,500.

While enjoying its wealth, Taiwan is very much aware of the importance of sharing its "Taiwan experience" with less developed countries. Recently Taiwan established a $1 billion overseas fund; the goal is to aid those less developed countries to promote their economies and industrial growth.

I hope Taiwan, under the guidance of President Lee Teng-hui, Premier Lee Huan, State Minister Fredrick Chien, and Foreign Minister Lien Chan, will continue to prosper. I also hope that Taiwan's overseas fund will achieve the objective of helping less developed nations to help themselves.

---

## TEDDY DOWNEY REMEMBERS HIS FRIEND, MICKEY LELAND

### HON. JACK FIELDS
OF TEXAS

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 28, 1989*

Mr. FIELDS. Mr. Speaker, I recently had the privilege of reading a moving article about our former colleague, Mickey Leland, which was prepared by an enterprising young journalist here in Washington, DC.

The journalist is Teddy Downey, 7-year-old son of Congressman TOM DOWNEY of New York. Teddy is a student at Brent Elementary School here in Washington, and is the editor, publisher, reporter, and circulation manager of "The Children's Newspaper," which he began recently and which he circulates to young people in his neighborhood.

When Mickey Leland died, many Americans were deeply saddened at the loss. Teddy Downey was one of those Americans. As his article makes clear, over the years, Mickey Leland had become an important part of the Downey household—coming to dinner often and sharing his love, good humor, and optimism with young Teddy.

With Mickey's passing, Teddy felt the need to express his sorrow and sense of loss. That's when his mother, Chris, suggested that he write down some remembrances of his friend, "Uncle Mickey." The result is the following article which I commend to the attention of my colleagues.

I'm reliably informed that Teddy already has announced his plan to write a book about Mickey. And judging from what this young man has accomplished in his brief 7 years, I'm pretty sure that it will be appearing in bookstores soon.

#### MICKEY LELAND

(By Teddy Downey, Age 7)

My mom was crying when he died. My dad was too. Mickey Leland was a great man. He was a congressman like my dad. My mom, my dad, Lauren and I treated him like one of the family. Mickey died in a plane crash. He crashed into a mountain. He was on a plane to Ethiopia to save starving hungry children. My mom and dad went to the funeral in Houston, Texas. That is three and a half hours from here. He has a wife, a boy, and a baby in her stomach.

We used to go out with him on Tuesdays for dinner. One time at dinner he brought his friend, Famous Amos, who makes wonderful, terrific cookies. His best friend is Ron Dellums.

One time Mickey Leland gave a speech on the floor of the House of Representatives and he spoke it in Spanish. He wanted to show the Members how difficult it was to speak one language. One other time Mickey flew to Ethiopia to unload one hundred pound bags of food for the starving people.

One other time Mickey Leland slept on the street on a cold winter's night to draw attention to the many homeless people. One of the best things about him is that he was very funny.

---

## THE TRAGEDY OF OUR PUERTO RICAN BROTHERS

### HON. ILEANA ROS-LEHTINEN
OF FLORIDA

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 28, 1989*

Mrs. ROS-LEHTINEN. Mr. Speaker, the tragedy of the people of Puerto Rico is felt by all of us in south Florida but especially in the areas of my congressional district known as Allapattah and Wynwood. These two neighborhoods are home to most of Dade County's Puerto Rican population and it is here where the anguish and the frustration is felt the deepest.

I have had many constituents call our office in great despair because their loved ones are without food, water, adequate shelter and other basic necessities. They are crying out to their families but are unable to communicate due to lack of a functioning phone system or telegraph service.

This devastating hurricane has been doubly troublesome for the frail, the sick, and the elderly. They are confused about the chaos around them and are worried that they will soon run out of the medicine and the medical attention that they normally require.

Our brothers and sisters in Puerto Rico need our help very badly now. All of us should unite in showing our compassion and our willingness to help.

Puerto Ricans need just about everything right now, but after talking to the person in charge of the hurricane relief effort in the Puerto Rican Governor's office, I find that there are some basic staples which are in desperately short supply.

Among these such items are: Food such as cereal, crackers, canned goods, juices and milk; baby goods such as disposable diapers, milk formula and food, evaporated milk, baby wipes, and Pedialite (for upset stomachs); medicine such as Tylenol, Panadol, Keopectate, Donage, Maalox, and suppositories; clothes including underwear and shoes for both adults and children; hygiene products such as toothbrushes and toothpaste, combs, shaving cream, towels and soap; and household products including paper towels, gas lanterns, matches, batteries, plastic bags and propane gas.

Many from south Florida have already shown your compassion for others and have contributed financially as well as by giving of your time. For those who can do more, please consider donating some of the previously mentioned items to our unfortunate neighbors in Puerto Rico.

---

## RADON TESTING FOR SAFE SCHOOLS ACT

### HON. BART GORDON
OF TENNESSEE

IN THE HOUSE OF REPRESENTATIVES

*Thursday, September 28, 1989*

Mr. GORDON. Mr. Speaker, today, I am introducing a revised version of the Radon Testing for Safe Schools Act. I am pleased that

---

**TSO Exhibit B**　　　　　　　　**BATES 000034**

NewsBank

## Thatcher to Shift British Policy on Rhodesia, Defense



PRIME MINISTER THATCHER
Supports hardline beefs

*At her election campaign wrapping its end, Margaret Thatcher candidly put forth her views on both foreign and domestic policy in an interview with Times reporter London bureau chief, Ronald Angeli, and Time's Frank Melville. The new British prime minister's comments:*

**On Rhodesia:**

You have got to go from where you are now. There is an internal settlement in Rhodesia...

---

# The Washington Star

**Rainy**
Mild tonight, low 54. Sunny and warm tomorrow, high 88. Chance of rain is near zero through tomorrow. Details DC2.

127th Year. No. 127 · WASHINGTON, D.C., MONDAY, MAY 7, 1979 · DC Phone (202) 484-5000

NIGHT FINAL
Late Stocks/Sports

15 Cents

---

CLOSE-UP

### Showbiz Priest Gilbert Hartke

Father Gilbert V. Hartke, Catholic University's showbiz priest who plays and wins the Washington game and has made Washington a friend in the country, is the subject of today's Close-Up, in Portfolio.

### Today's News

**UP FRONT**

British Prime Minister Margaret Thatcher speaks candidly on foreign and domestic policy in a special interview with Time......A-1

Israel Prime Minister Menachem Begin is expected to urge Lebanon to negotiate a peace treaty.......A-1

An estimated 65,000 people march to the Capitol to denounce the nuclear power industry.......A-1

Sen. Bob Dole says the majority of Americans want a SALT II treaty and warns GOP against opposition to the U.S.-Soviet pact.......A-1

The oil crunch shows signs of development in Washington as gas stations around the Capital Beltway are hard to find open.......A-1

Sen. Sithole and 11 Zimbabwe African Union members boycott first meeting of Rhodesia's black-dominated legislature.......A-1

**NATIONAL**

President Carter falls short of his goal of saving 50 women to federal judgeships, but adviser Sarah Weddington says he's not to blame...A-2

**FOREIGN**

World champion Anatoly Karpov and fellow Soviet Mikhail Tal share honors in the World Challenge Cup chess title.......A-3

Ayatollah Khomeini orders the formation of a special armed force responsible solely to secret religious Revolutionary Council.......A-3

**METRO**

The real estate boom and housing price spiral in metropolitan Washington is going higher faster, figures show.......D-1

The District's assistant city administrator for operations says the city government must spend $1 billion for road repairs.......D-1

Some of the city's opticians charge the Medicaid policy as racist and a dodge to keep welfare eyeglass money in white hands.......D-1

**PORTFOLIO**

Friars Club in New York honors "Tonight Show" host Johnny Carson as Entertainer of the Year.......C-1

Beverly Sills ends a beautiful love affair with the City Opera by saying "Thank you" in a glowing performance of Kennedy Center.......C-1

**TELEVISION**

Fasten your seatbelts and get ready to fly on NBC's swift "Roller Coaster" ride.......C-5

**BUSINESS/FINANCE**

FTC chairman Michael Pertschuk says that large corporate mergers may result in distortions of the nation's political process.......C-6

Boeing executives, going into share-holders meeting with a shining record, face tough questions on Justice Department anti-trust probe.......C-6

**SPORTS**

Bullets' Mitch Kupchak adds sparkling dimension to the ordinary nightmare backcap player.......D-4

Maryland's Renaldo "Skeets" Nehemiah credits falling behind at the start with spurring him to lead at the finish.......D-2

| | |
|---|---|
| Action Line.....DC-8 | Editorials.....A-10 |
| Amusem't.....C-4 | Feature.....C-6 |
| Bridge.....DC-7 | Goldenagers.....A-6 |
| Classified.....DC-14 | Horoscope.....DC-7 |
| Comics.....DC-8 | Hughes Rowan.....A-9 |
| Crossword.....DC-6 | Losts.....DC-14 |
| Dear Abby.....DC-7 | Obituaries.....C-5 |
| Editorials.....A-10 | Sports.....DC-2 |
| Editorial Articles.A-11 | Stocks.....DC-1 |
| Estate & Bequest.C-6 | Television.....C-5 |
| Federal Column.DC-3 | TV Radio.....C-4 |
| Finance.....C-6 | Weather.....DC-2 |

---

## Protest Scores Nuclear Industry

**65,000 Biggest Crowd Since Vietnam**

By John Tierney
Washington Star Staff Writer

Vowing to eliminate America's nuclear power industry, thousands of people from two dozen states marched to the Capitol yesterday for what appeared to be the largest protest rally here in nearly a decade.

Police officials, who estimated the crowd at 65,000 to 70,000, said they could recall no bigger demonstration since the anti-war march at the time of the D.C. invasion of Cambodia in 1970...



Gov. Edmund G. Brown Jr. and actress Jane Fonda lead list of speakers.

---

## Hill Gets Changed Gas Ration Plan

By Roberta Hornig
Washington Star Staff Writer

The White House today formally sent Congress a significantly altered standby gasoline rationing plan — in the hope that the proposed changes will improve chances of its passage this week...

### Talmadge Aide Reiterates Denial She Typed Memos

By Edward T. Pound
Washington Star Staff Writer

---

## Begin Proposes Israel-Lebanon Summit Session

TEL AVIV, Israel — Prime Minister Menachem Begin, in a major speech, is expected to urge the Lebanese government to negotiate a peace treaty and will warn it that Israel will not take its more Palestinian refugees, Lebanese reported said...

### Most Americans Want SALT II, Sen. Dole Says

By James R. Dickenson
Washington Star Staff Writer

Republican presidential candidates who have reservations about the coming strategic arms limitation treaty agreement between the United States and Russia must be very careful in handling the issue because a big majority of the American people want it, Sen. Bob Dole, R-Kan., said today...

### Sithole, 11 Others, Boycott New Rhodesia Parliament

By Lawrence K. Fenick
Special to The Washington Star

SALISBURY, Rhodesia — The Rev. Ndabaningi Sithole and 11 others elected to Parliament from his party boycotted the first gathering of Rhodesia's new black-dominated lawmaking body today...

---

## Gas Pinch Felt Around Beltway With Most Stations Closed

By Duncan Spencer
Washington Star Staff Writer

Fear and loathing came to the Capital Beltway yesterday. The fear was the kind that grips the owner of a V-8 tooling at 60 miles per hour with a gas tank needin' held off the "E" only by prayer...

---

ESO Exhibit C                    BATES 000035

NewsBank

# 1st EDITION

## The Washington Star

# Portfolio

• Amusements   • Finance

SECTION C

MONDAY, MAY 7, 1979

## TV TONIGHT

### Roller coasters, Cosell compete in sensurround

By Bernie Harrison
Washington Star Staff Writer

The nuclear-powered "Supertrain" was a dumb trip, on the wrong track. Here's NBC on the right track for a swift one-night ride out of the Nielsen basement, with "Roller Coaster" (WRC-4 at 8), an effective pop entertainment that played the movie houses two years ago with "Sensurround" effects that were more amusing than scary.

In any event, you won't miss them tonight.

Advice for grownups who get queasy at the sight of one of those midway monsters: Skip the opening (a spectacular crash), and the finale, with a ride that features a bomb-threatening villain (Timothy Bottoms) and a camera mounted on a coaster, and the point of view of people on the ground (including us) who always expect the worst, most of what you'll see in your head monitors melodrama.

That's George Segal as the inspector who, with other safety officials and law officers, is trying to track down the extortionist who is sabotaging roller coasters from coast to coast. And his identity (actor Timothy Bottoms) is no mystery to the audience. The cat-and-mouse game he coolly wages with Segal is terrifically staged. Richard Widmark plays the federal agent; Henry Fonda, a safety executive.

In the battle for young viewers (at 8) "Roller Coaster" is as irresistible as a cookie jar. The ABC competition is the other of those schlocky "TrashSports" specials (WJLA-7), "Battle of the Network Stars," with Sensurround by Howard Cosell. For grownups, called in or sober as your public TV channel, with a Bill Moyers Journal conversation with California's Gov. Jerry Brown and the premiere of a new miniseries version of "The Prize of Miss Jean Brodie."

### The premiere

"The Prize of Miss Jean Brodie" (public TV at 9), Maggie Smith was perfect in that eccentric school teacher who prided herself as "being in her prime" — 40 years of age. Now put Maggie out of mind, if you can, and sit back and enjoy watching a six-part serial, with Geraldine McEwan as Miss Brodie. How did they manage this, out of the slim Muriel Spark novel? By juxtaposing elevations of the original, focusing on students in her classes. You won't want to miss the introductory episode as she arrives to fill a teaching post at the Marcia Blaine school, and learn her grip and stuff on Founder's Day. You (and the students) will fall under her spell.

### News/documentary notes

"NBC Reading News" (WRC-4 at 8:30). Beginning tonight, a five-parter on organized crime in the recording industry.

"Bill Moyers Journal" (26 at 9). Is California's Gov. Jerry Brown a true visionary or merely opportunistic? Watch him, with Moyers, as he issues that his record is consistent (despite changing his position on issues) has the nation's most liberal attitude is like his concept of politicians as "rascals," which he terms "a relatively humble and progressive... the con- versation flows.

"The Originals: Women in Art" (26 at 10). The classic introductory art history textbook, Marcia Tucker points out, doesn't mention a single woman artist. This series (a re-run) takes care of that omission, and does it with the first show, a superb profile of Georgia O'Keeffe.

### Specials

"Battle of the Network Stars" (WJLA-7 at 8). It's the sixth meeting of Pepperdine College in Malibu, with Dick Van Patten as captain of the ABC team; Jamie Farr, of "MASH," heading the CBS contingent, which includes "The Incredible Hulk", Gavin Ferrigno) and Bob Conrad, of the "Duke," leading NBC. The events: swimming, kayak racing, baseball dunk, obstacle course, running relay, football and tug-of-war.

"John Davidson" (not on the air at 9). (Bernie). A lively adaptation of the John Jakes novel that picks up with the one of historical figures (Ella Tom Bosley as Ben Franklin). Andrew Stevens stars. The rerun precedes the upcoming "The Rebels" (May 17,14) that picks up the story where this left off.

"Playboy's 25th Anniversary Celebration" (WJLA-7 at 10). The setting: Hugh Hefner's Playboy Mansion West. Guest greeters, James Caan, Tony Curtis and Gladys Plimpton. You'll need Candy Loving, of Norman, Okla., Anniversary Playmate, and the long-stemmed ranch offing. Hefner — who makes all the final decisions — picked Candy from three finalists. Also scheduled, clips from "Playboy After Dark" shows, and a trouble, in the suffocating Playboy style, of changes in American life during the 25 years of King Hugh's reign.

### Series

The coach tries to help a player with a drinking problem on "The White Shadow" (rerun (WDVM-9 at 8), but it's the team itself, taking drastic action, that works. Eric Kilpatrick as the player — and that's his real-life father Lincoln Kilpatrick, playing the minister... This "M&M" rerun (WDVM-9 at 9) gives us an offbeat look at Jaime Sommers, the original bionic woman, as a young soldier, recording his responses to being wounded, the copter trip, treatment and post-operation. He even notes the company's potential response to Col. Potter's unaccountably testy station... On "M&M" in Cincinnati" (WDVM-9 at 9:30), the staff of home that there, with an appreciative low stabs — it Harold's there, too. Crandmother who calls the radio business after he's kicked out of military school. A fresh episode, but a wrong note for the series... Jim Rockford and stands wake on the "Cinema Ends" (WDVM-9 at 10) originally announced for tonight at an earlier date. At that late chute, Cincy (Warren) being used for community property by its friend (Cleva Dimson). Hunt finds good reason to be cynical... The NBC movie isn't quite long enough to fill the entire prime-time schedule, hence "The Real West" (WRC-4 at 10:30)... Dick Cavett talks to Fritz Mondew, author of "Exploding Star: a Young American Against Bitter" (26, 22 at 11)... Bob Blakely (ech, "Dwight" (WRC-4 at 11:30), with Marty Mull and Fern Bar- hart. The Ear, our modest entry... Tom Snyder (WRC-4 at 1) talks to Danny Sheehan, attorney for the Karen Silkwood family, and Texas evangelist James Robinson, whose religious pro- gram was recently taken off a Texas TV station.

Television listings, C-4

## The Ear

... is back at its oar. The result ap-
pears tomorrow. [Henry]



Hartke (clockwise upper left) "This is America" (1942), with Myrna Loy (1945); today, on the Loyola Academy football team; and with Mercedes McCambridge and Hugh O'Brian (1972)

## Father Hartke — Washington's showbiz priest

'No accomplishment comes near to the internal peace I know'

By Pat Lewis
Washington Star Staff Writer

Father Gilbert V. Hartke is one of Washington's best contacts. It is a title to which he is well suited and can cope with ease, in positive reviews.

In his black suit and white collar, at a luncheon table at Duke Delbert's restaurant, he takes a businessman by the lapels and breathes, "Milton, I need 10,000 bucks for my kids."



It's a party he nurtures Patty Duke, whose spark means everyone with a spiritual nook, and eyeball-to-eyeball, says "Mrs. Logan, I need $25,000 for my kids."

With the money he coaxed from the city's rich, he made Catholic University's drama department one of the best in the country — and this at a time when there was a general dearth of culture in Washington and considerable opposition to the frivolity within the Church community. He raised $2.5 million to build a theater and teaching facility. Countless students have received financial aid or help getting jobs.

But Hartke isn't party V. Hartke, age 73, his famous Washington institution.

He wakes up and goes to bed in a Dominican monastery. In between, he heads Catholic University's trends here-off.

But no one gets hurt. There's a sense of good in Father Gilbert V. Hartke.

The Dominican Home is cold and dark and beginning to stir at 4:45 a.m. Fathers, dressed in white habits, descend the staircase, clip-flopping in a way, some of them covered financial aid or the pitch.

In darkness, he prays V. Hartke, age 73, his increasingly Washington institution.

He wakes up and goes to bed in the Dominican monastery. In between, he heads Catholic University's drama department.

See HARTKE, C-3

men and social glitterati. It's difficult to put the showbiz priest and the Dominican priest in perspective. On one hand there's only one way to play the Washington game: be recognized in the right place with the right people all the time. Perhaps even a priest has to play that game.

On the other, a scrubbers ambition for recognition ends with humble take where Catholic University's needs leave off.

But no one gets hurt. There's a sense of good in Father Gilbert V. Hartke.

The Dominican Home is cold and dark and beginning to stir at 4:45 a.m. Fathers, dressed in white habits, descend the staircase, clip-flopping in a white porcelain font, cross themselves with holy water and droop-eyed into their early morning devotional.

Red prayer books in hand, the priests sit in dark oak benches of the choir, facing each other across the robe-carpeted aisle; tones are yawning. Several are nodding.

Blue jeans, Earth shoes and tennis shoes are visible beneath the white robes.

Hartke has black suit pants, shiny black shoes and a thermal underwear shirt under his habit. He is wearing two sweaters.

When the chanting and meditation are finished 25 minutes later, Hartke and a few others remain. Facing the altar they silently read the monk prayers they will miss. When they finish, Hartke flips to the tablecloth. The chapel is dark.

Moments later, in a white room, where the bell, he does another layer of heads, this one with blue markings, and says the mass he will miss in the evening.

Fifteen minutes later, Hartke walks down the cloister walk to the dining room where he dresses All from its suits and orders some fresher blueberry pancakes. "What about you big guys?" asks a youngster priest holding a stainless steel

pitcher. "Do you want some orange juice?" Hartke accepts.

Father Fox, a young priest studying canon law, joins him. When the cook comes to tell him the pancakes are ready; Hartke tells Fox to call him some, enters a cup of black coffee.

He likens his looks to Marlon Brando in "Superman." His long, thick gray hair a fish blond, he calls it in swept back-off his face. He weighs 190 pounds, has blue eyes, and a dear, round face and looks a bit like Marlon Brando in "The Godfather." He looks somewhat like the billboard nails limp out of the left side of July mouth.

"The voice is an accident — dyslexia on the eye of two left ones (three on his voice) cheeks. The dingiy wide hopes is five." A student at the Pine Arts Institute in Chicago, he learned a touch-womanly trait, too.

Hartke grew up in Chicago's North Side where his father owned the only drug store, the Pine Colony Drug Store, at 49, ...as bustling with actors from the Emplay Film Studios.

See HARTKE, C-3

## Friars Club names Johnny Carson 'Entertainer of the Year'

By Judy Flander
Washington Star Staff Writer

NEW YORK — "You scared the hell out of Freddie Silverman," Loudon Hall told Johnny Carson last night. "You shouldn't do that, he's too young to die."

Johnny Carson, exploded later; "I was waiting out the Lee Marvin decision to see if I could get hold of NBC."

It wasn't a private conversation. Loudon Hall was scolding J. C. (Johnny Carson — not Jesus Christ — although at times it was hard to tell the difference).

More than 2,000 people crammed into the Grand Ballroom of the Waldorf-Astoria hotel to attend a Friars Club dinner honoring the host, Johnny Carson, as Entertainer of the Year. The dinner was phenomenal, long before Carson's half-hour of NBC President Fred Silverman, by saying he was going to quit. Carson has since started work to work on the project. To keep abreast of the $4 million tangle and to announce meant increased ticket sales — at $250 a plate — to the Friars' party.

The New York peppered, including Ron Galella, commissioned the VIPs at a producer reception two hours.



NBC president Fred Silverman at the microphone, Carson in stitches

For awhile, they stood around asking each other "who's that?" (Answer: "Nobody"). But when the pack caught sight of Someone Firehorse and Kirk Douglas, Broadway star Dorothy London ("Annie Hall's dance"). The cry "Entertainer" went up again.

"Why are you here?" someone asked Kirk Douglas. "Why does everyone ask me that?" Kirk Douglas replied, dimpling.

Lee Slate, greying elderly, was still kneeling in front of Lucille Ball, before shooting, "Have you got enough? Ball's husband, Gary Morton, finally asked the man, "Oh," Lucy said, "like Lee, the pop goes with the hair."

There was a moment when columnist Pete Hamill walked to try and photographers kept their cameras fixed. Woodshy knocks Faca's, on the eve of his birth Silverman; waving mean to his best legged baby; said none them to a wine celebrity.

And then Johnny Carson himself rolled, and all the television lights perhaps risen went on, as if the sun came alive Gally sad Silverman, now for the men in a little... Baldheaded people, rich silly people, skinny wheeled-on-their-arms people, silver leather-jacketed television lights that fiercely rolled bright blinked, limbs snarls bit Steel Washs.

See CARSON, C-3

# PERFORMANCE

## L.A. Philharmonic: Stunningly powerful

By Theodore W. Libbey Jr.
Washington Star Staff Writer

After conducting his first season at a manic director of the Los Angeles Philharmonic last week — with a flingning all-French program, bill- liantly fervid and luminously partne — Carlo Maria Giulini has taken his orchestra on tour and is showing that he and they could do it just as well with the Germanic repertoire that he has chosen for his radical-Ger- man performance, on a hard and will with the accompanying the finest of the horn is amazingly a magnificent new

constellation in the firmament of American orchestras. The powers of the orchestra were so smoothly and so fully revealed that much of the time one thinks as if with a weight dropping into the night of the waiting what would hap-...

This is what Giulini does to orchestras, and what they do to audiences when they are in his hands. In each of the three works on the Los Angeles program — C-3, with Weber's Over- ture to "Der Freischütz," the Sym-

See PHILHARMONIC, C-3

## The New Barbarians

By Charlie McCollum
Washington Star Staff Writer

It took just so long.

As the New Barbarians launched into its initial number, a group of teenagers standing in the crowd began chanting, "We want Jagger! We want Jagger!"

The head couldn't hear the chants over the bolling rock 'n' roll din with music kicking off its sharp Saturday night. But, for a while at least, it looked like the New Barbar- ians — a "pickup" group which in- cludes Rolling Stones Ron Wood and

See BARBARIANS, C-3

Keith Richards

## Final City Dance

By Anne Marie Welsh
Special to The Washington Star

The final program of City Dance '79 Saturday laced the charge of the first two. But the sometimes was an exciting performance by a new company by company named and ... the Raquel Pena Spanish Dance Company — a smaller than usual audience of the troupe made the last show a disappointment. Spinning her energy of the program with two modest dance pieces, both youthful exercises in witty musicianship, "Overture" and

See CITY DANCE, C-3

## Ovations for Bubbles

By Theodore W. Libbey Jr.
Washington Star Staff Writer

After acknowledging the reading ovation, after receiving the flowers handed up from the orchestra as throwing from the orchestra, after lis- tening to the remarks of Julius Rudel ("This is the last time we perform to- gether ...."), and accepting a memento from the Kennedy Center's Martin Feinstein and Roger Stevens — Beverly Sills said, not "farewell," but "thank you."

"I would just like to thank you," she declared firmly to the Opera House

See SILLS, C-4

Beverly Sills

## City Opera's Carmen

By Tim Smith
Special to The Washington Star

The New York City Opera's produc- tion of "Carmen" succeeds not be- cause of a single cast or a stylish (al- bove sturdy) singer, for, it it has led — but, but rather because it effec- tively demonstrates in a solid, straight- ward, unpretentious, and ultimately profound way, the true art of a production in which the composer's the main attraction, a rare but wel- come change of emphasis.

With the opening flourish of infec- tions melodies, the listener is quickly

See CARMEN, C-3

News Bank

# HARTKE

Continued from C-1

Monday, May 7, 1979    The Washington Star   C-5

# Carson: Celebrity dinner

Continued from C-1



THE EYEWITNESS NEWS SERVICE

THIS WEEK ON TV9

WOMEN: WANTING IT ALL

The One & Only TV 9

Watch Eyewitness News tonight at 5:30 & 6.



TO PLACE A CLASSIFIED SUCCESS AD CALL 484-6000





What's the difference?

One's liberal. One's conservative.
Tom's left. Pat's right.
Together they prove there's
two sides to every story.

Join in the confrontation.
Pat Buchanan vs. Tom Braden.
Weekdays, 4 to 7 PM.
Call 966-TALK.

You never know
what's gonna
happen next.
Unless you listen!

WRC RADIO
NEWS TALK 98

Someone
in Hollywood
is trying
to destroy
the world.

HOLLYWOOD: ITS EFFECTS ON YOU.
A SPECIAL SERIES
THIS WEEK AT 5:30

NewsCenter4


WRC-TV

BATES 000637

## 1986 ADM 001663 IN RE: HARTKE, GILBERT V // PERS. REP: NAL

- Case Type:
- Admin Estate
- Case Status:
- Closed
- File Date:
- 01/01/1986
- Action:
- Not Available From Legacy
- Status Date:
- 01/01/1986
- Next Event:

All Information    Party    Disposition

### Party Information

**HARTKE, GILBERT V**
- Decedent
- Disposition
- Disp Date

Alias

Party Attorney

### Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Closed | 01/01/1900 | NOT AVAILABLE FROM LEGACY |

**TSO Exhibit D**          **BATES 000038**

Case 1:22-cv-03571-PGG   Document 21-6   Filed 05/18/22   Page 1 of 1

THE WASHINGTON POST
Thursday, March 1, 1973   H9

— PEOPLE/THE ARTS —

## Clay Goss: Busy Building

By Angela Terrell



Playwright-poet-author Clay Goss: "I like to think of Washington as 'Chocolate City'—but in an esthetic, beautiful sense."
*By James W. W. Atherton—The Washington Post*

### Performances Canceled

## Bergman on Broadway

## College Theater's Ten Finalists

By Megan Rosenfeld









villa ROSA RESTAURANT & DINNER THEATRE

Send Me No Flowers

THE JOHN F. KENNEDY CENTER
EISENHOWER THEATER — (202) 254-3670

elizabeth ashley
fred gwynne
in
the enchanted

OPERA HOUSE — (202) 254-3770
SEATS NOW AT BOX OFFICE

REX HARRISON
in
EMPEROR HENRY IV
EILEEN HERLIE

Virginia License Plate Information
(1) 770-7181

Theatres

The Heartbreak Kid

Grease

SLEUTH

Jane Fonda
Donald Sutherland
Peter Boyle
STEELYARD BLUES

the CINEMA

CHARLES CHAPLIN'S
LIMELIGHT

EMBASSY

HERE'S A SEE-WORTHY COMEDY TO KEEP YOU IN STITCHES

Doctor in Trouble
Starring LESLIE PHILLIPS
ROBERT MORLEY
Starts TOMORROW
MacARTHUR

ACCENT THEATRE AT THE IL CASTELLO
BELL BOOK & CANDLE
DRACULA

MID ATLANTIC/DC PHOTO FESTIVAL
MARCH 9, 10, and 11
SHOREHAM HOTEL

— HOLOGRAPHY —
21ST CENTURY PHOTOGRAPHY

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

BATES 000039



LOG IN

Tennessee
wo... shot 12-
year-old boy o...

Homeowner
fatally shoots 2
intruders, hold...

Amber Heard
says
honeymoon...

Trump Russia
adviser Fiona
Hill recalls...

Audit finds half
of Joe Biden's
Twitter followe...

It's 'bruising'
day for Johnny
Depp, Heard...

GET 30 DAYS FREE

NEWS

# Battle looms over $1.5M 'Wizard of Oz' dress found in storage closet

By Kathianne Boniello

May 7, 2022   8:19am   Updated

**TSO Exhibit F**

**BATES 000040**

## NEW YORK POST

LOG IN

Tennessee woman shot 12-year-old boy o...

Homeowner fatally shoots 2 intruders, hold...

Amber Heard says honeymoon...

Trump Russia adviser Fiona Hill recalls...

Audit finds half of Joe Biden's Twitter follows...

It's 'Bruising' day for Johnny Depp, Heard...



Barbara Hartke is fighting over the original ownership of Dorothy's Dress.

Eli Branson/@elifromchi; Everett

**MORE ON:**
*WIZARD OF OZ*

**Councilman celebrates Democrat's defeat with 'Wizard of Oz' song**

**The best (and worst) of Hollywood's book adaptations**

**$370 for kids costumes?**

**Adding a dimension to 'The Wizard of Oz'**

She's not over the rainbow about this Hollywood memorabilia auction.

A Wisconsin woman has gone to court to stop the sale of a long-lost piece of movie history: the blue and white gingham pinafore dress worn by Judy Garland in the "Wizard of Oz" —

# NEW YORK POST

LOG IN

| Tennessee woman shot 12-year-old boy o... | Homeowner fatally shoots 2 intruders, hold... | Amber Heard says honeymoon... | Trump Russia adviser Fiona Hill recalls... | Audit finds half of Joe Biden's Twitter followe... | It's 'Bruising' day for Johnny Depp, Heard... |

"I was just surprised after all this time, here it had been found, and here it is being rushed off to the auction house," Barbara Hartke, 81, told The Post.

"I just want to know who has ownership over this … I'd like to see the documentation.," she added.

The costume, complete with a short-sleeved blouse of cream organdy and Garland's name written on a label on the inside, was a present from actress Mercedes McCambridge to Hartke's uncle, Rev. Gilbert Hartke, a famous-in-his-own-right priest and professor who founded the university's drama department, the family contends in a $3 million Manhattan Federal court lawsuit. It's unclear how McCambridge came to own the dress.



TSO Exhibit F                    BATES 000042        3/12